1  PAUL ANDRE (State Bar No. 196585)
   BRENDA N. BUONAIUTO (State Bar No. 173919)
2  JAMES HANNAH (State Bar No. 237978)
   KING & SPALDING LLP
3  Four Embarcadero Center, Suite 3500
   San Francisco, California 94111
4  Telephone: (415) 318-1200
   Facsimile: (415) 318-1300
5  Email: pandre@kslaw.com
          bbuonaiuto@kslaw.com
6          jhannah@kslaw.com
7  Attorneys for Plaintiff
   DG COGEN PARTNERS, LLC
8

ORIGINAL
FILED

JUL − 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SBA

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12                                          CV 08    3249

13  DG COGEN PARTNERS, LLC,              CASE NO.

14                Plaintiff,

15       v.                             **COMPLAINT; DEMAND FOR JURY TRIAL**

16                                      **(1) UNFAIR COMPETITION AND FALSE ADVERTISING UNDER THE LANHAM ACT;**
    HESS MICROGEN, LLC; HESS
17  CORPORATION, formerly known as      **(2) BREACH OF CONTRACT;**
    AMERADA HESS CORPORATION;           **(3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
18  DOOSAN INFRACORE AMERICA
    CORPORATION, individually and as    **(4) BREACH OF EXPRESS WARRANTY;**
19  successor-in-interest to DAEWOO HEAVY
    INDUSTRIES AMERICA CORPORATION;     **(5) BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;**
20  ADVANCED POWER DISTRIBUTORS,
    INC.; and DOES 1-100, inclusive,    **(6) BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY;**
21
                                        **(7) UNCONSCIONABILITY;**
22                Defendants.           **(8) FRAUD;**
                                        **(9) FRAUDULENT INDUCEMENT;**
23                                      **(10) NEGLIGENT MISREPRESENTATION;**
24                                      **(11) TORTIOUS INTERFERENCE WITH CONTRACT;**
25                                      **(12) NEGLIEGENT INTERFERENCE WITH CONTRACT;**
26                                      **(13) INTENTIONAL INTERFERENCE**
27
28

**WITH PROSPECTIVE ECONOMIC ADVANTAGE; (14) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

Plaintiff DG Cogen Partners, LLC ("DG Cogen") alleges for its Complaint against defendants Hess Microgen and Hess Corporation, formerly known as Amerada Hess Corporation (collectively, "Hess"), Doosan Infracore America Corporation, individually and as successor-in-interest to Daewoo Heavy Industries America Corporation ("Doosan" or "Daewoo"), and Advanced Power Distributors, Inc. ("Advanced Power") (all collectively, "Defendants"), as follows:

### PARTIES

1.    Plaintiff DG Cogen Partners, LLC is, and at all times mentioned was, a limited liability corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in San Luis Obispo, California. DG Cogen is in the business of providing environmentally-friendly energy solutions, including through installing and operating cogeneration systems.

2.    DG Cogen is informed and believes and thereon alleges that defendant Hess Microgen, LLC ("Hess Microgen") is, and at all times mentioned was, a limited liability corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in New Jersey. On information and belief, Hess Microgen is a wholly owned subsidiary of defendant Hess Corporation, formerly known as Amerada Hess Corporation, and is in the business of designing, manufacturing, assembling, marketing, distributing, selling, and delivering cogeneration systems and of selling related maintenance services. On information and belief, Hess Microgen is also in the business of leasing, installing and operating cogeneration systems, including in the State of California.

3.    DG Cogen is informed and believes and thereon alleges that defendant Hess Corporation, formerly known as Amerada Hess Corporation ("Amerada Hess") is, and at all times mentioned was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York. On information and belief, Amerada Hess is the

2

1   parent of Hess Microgen, is directly involved in the operations and control of Hess Microgen, and

2   insures the liability arising out of the acts and omissions of Hess Microgen and its employees and

3   other agents.  On information and belief, Amerada Hess is also in the business of crude oil and

4   natural gas exploration and production.

5       4.      DG Cogen is informed and believes and thereon alleges that defendant Doosan

6   Infracore America Corporation is, and at all times mentioned was, a corporation organized and

7   existing under the laws of the State of New York, with its principal place of business in Suwanee,

8   Georgia.  On information and belief, Doosan is the successor-in-interest to Daewoo Heavy

9   Industries America Corporation, whose controlling interest was purchased by Doosan and whose

10  name was changed to Doosan Infracore America Corporation.  On information and belief, Doosan

11  is in the business of designing, manufacturing, assembling, marketing, distributing, selling, and

12  delivering industrial and construction machinery and equipment, including engines for use in

13  cogeneration systems.

14      5.      DG Cogen is informed and believes and thereon alleges that defendant Advanced

15  Power Distributors, Inc. is, and at all times mentioned was, a corporation organized and existing

16  under the laws of the State of Kansas, with its principal place of business in Sublette, Kansas.  On

17  information and belief, Advanced Power is in the business of selling, distributing and delivering

18  industrial machinery and equipment, including Daewoo engines used in cogeneration systems.

19      6.      The true names and capacities of defendants Does 1 through 100, inclusive, are

20  unknown to DG Cogen, who therefore sues said defendants by such fictitious names.  DG Cogen

21  will seek leave of court to amend this Complaint to substitute the true names of these defendants

22  when the same have been ascertained.

23      7.      DC Cogen is informed and believes and thereon alleges that, at all times mentioned,

24  each and every defendant was the agent, affiliate, servant, employee, partner, co-conspirator,

25  and/or joint venturer of the other defendants and that each defendant was acting within the course

26  and scope of one or more of those relationships.

27                    **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

28      8.      DG Cogen brings claims that include unfair competition and false advertising in

3

COMPLAINT; DEMAND FOR JURY TRIAL

1    violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This Court therefore has

2    original jurisdiction of this action, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction

3    over the claims arising under state law, pursuant to 28 U.S.C. § 1367(a).

4           9.     Defendants are subject to the jurisdiction of this Court by virtue of their respective

5    business dealings, including the sales, distribution and delivery of cogeneration systems and parts

6    and the provision of related services, in this District and by having caused harm in this District

7    through their respective acts and omissions.

8           10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391, in that a substantial

9    part of the events or omissions giving rise to the claims occurred in this District and a substantial

10   part of the property that is the subject of this action is situated in this District.

11          11.     Assignment to the San Francisco Division of this District is proper because a

12   substantial part of the events or omissions giving rise to the claims occurred in San Francisco and a

13   substantial part of the property that is the subject of this action is situated in San Francisco.

**GENERAL ALLEGATIONS**

15          12.     Cogeneration technology involves the use of a natural gas engine to generate both

16   electricity and useful heat. In cogeneration, generated heat from an engine is also used for other

17   purposes such as hot water supply or refrigeration. Benefits from cogeneration include reducing

18   environmentally harmful emissions, increasing energy efficiency, reducing energy costs, and

19   reducing demand spikes and their related strains on statewide electric power grids.

20          13     Hess designs, manufactures, assembles, markets, distributes, sells, and delivers

21   cogeneration systems, including the Hess Microgen 200 Packaged Cogeneration System, a

22   cogeneration system that uses an engine manufactured by Doosan (formerly Daewoo). Hess also

23   sells maintenance services for its cogeneration systems. On information and belief, Hess Microgen

24   is also in the business of leasing, installing and operating cogeneration systems, including in the

25   State of California..

26          14.     In or around December 2000, Hess entered into a written agreement with

27   RealEnergy, Inc. ("RealEnergy"), with its principal place of business in California, for the sale and

28   purchase of a number of cogeneration systems, including Hess Microgen 200 Packaged

4

1   Cogeneration System units, which Hess packaged with Daewoo engines (the "Hess-RealEnergy

2   Contract"). *See* Exhibit A. Hess knew that RealEnergy planned to use the systems to, among

3   other things, service investors and customers in California. On information and belief, Hess made

4   numerous representations to RealEnergy to induce RealEnergy to enter into the Hess-RealEnergy

5   Contract, including that the systems were "rich burn" (requiring less steps than "lean burn" to meet

6   regulatory compliance) and have an output of at least 192kWH on natural gas. Hess knew, or

7   should have known, that those representations were false. Further, on information and belief, Hess

8   sold the cogeneration systems to RealEnergy with numerous defects, including but not limited to

9   defects in the engines and controls, that were known to Hess but were not known or disclosed to

10   RealEnergy.

11        15.   In early 2004, DG Cogen sought to purchase the Hess cogeneration systems from

12   RealEnergy. DG Cogen planned to assume existing RealEnergy leases and/or to enter new leases

13   for space on rooftops and in parking garages of commercial buildings located in San Francisco and

14   other parts of California, for the purpose of installing and operating the cogeneration systems. As

15   part of the leases, DG Cogen would sell the electricity and heat generated by the cogeneration

16   systems to the commercial building owners at a savings compared to the utility rate.

17        16.   Hess knew that DG Cogen sought to purchase the Hess cogeneration systems from

18   RealEnergy and to enter into and/or assume the related leases, which were primarily with

19   customers in San Francisco. Hess had direct involvement with that transaction and made

20   numerous representations to DG Cogen to induce DG Cogen to enter into a purchase agreement

21   with RealEnergy. Hess' involvement also included investing monies in the repair and/or retrofit of

22   the units prior to the purchase of the units by DG Cogen. Hess also provided assurances to DG

23   Cogen that the units would operate and run at the technical specifications set forth in the Hess

24   informational and promotional material for the units, which Hess made or caused to be made

25   publicly available on the Internet and which it disseminated, among other ways, through its

26   engineers. Those specifications included that the units were "rich burn" and had an output of at

27   least 192kWH on natural gas. Hess knew, or should have known, that the representations it made

28   to DG Cogen about the units, including with respect to their functionality and reliability, were

COMPLAINT; DEMAND FOR JURY TRIAL

1   false.

2       17.    Further, in or about June and July 2004, DG Cogen and Hess jointly visited

3   numerous sites in California where the units had been installed, and Hess separately visited a

4   number of California sites, so that Hess could provide assurances to customers that the units DG

5   Cogen planned to purchase would operate to specification. Those sites included major commercial

6   office buildings in San Francisco. The assurances provided by Hess to DG Cogen and to DG

7   Cogen's prospective customers were material to DG Cogen's decision to purchase the Hess

8   cogeneration systems.

9       18.    Further to those assurances, on or about July 7, 2004, DG Cogen sent an e-mail to

10   Hess stating its concerns with reported recent operational problems in the Hess cogeneration

11   systems that DG Cogen planned to purchase. Hess replied the same day, assuring DG Cogen that

12   Hess had a plan of action for remedying the problems, by replacing the engine heads on the

13   cogeneration systems. Hess assured DG Cogen that the engine heads would be replaced, and the

14   operational problems remedied, prior to DG Cogen's planned purchase of the units. Hess also

15   represented to DG Cogen that the problems with the cogeneration systems were unexpected and

16   that the cogeneration systems were not fundamentally or critically defective. Hess made those

17   representations despite its knowledge, which it failed to disclose to DG Cogen, that the units were

18   defective and that there had been significant problems across the product line for years, including

19   specifically with the engines.

20       19.    On or about July 23, 2004, in direct and justifiable reliance on Hess'

21   representations, including that the units were "rich burn" and would operate at the level described

22   in the specifications, DG Cogen entered into a written agreement with RealEnergy, whereby DG

23   Cogen purchased the Hess cogeneration systems and other assets, including an assignment of

24   customer leases and of "all rights, claims and causes of action" that RealEnergy may have related

25   to the cogeneration units, including claims arising under the Hess-RealEnergy Contract. *See*

26   Exhibit B. On the same day, Hess agreed to maintain the cogeneration units for DG Cogen,

27   pursuant to a long-term services agreement. Further, on or about July 29, 2004, Hess agreed, in

28   writing, to refurbish 12 of the cogeneration units owned by DG Cogen and to perform any other

6

1    work necessary for the systems to perform to their warranted and represented specifications.

2        20.    Subsequent to its purchase of the cogeneration units, DG Cogen, on numerous

3    occasions, notified Hess that the units were not operating as warranted and represented and/or were

4    completely failing.  Among other things, the units failed to generate electricity at or near the rated

5    capacity of at least 192kWH and the system controls were failing.

6        21.    For instance, on or about September 3, 2004, DG Cogen notified Hess by e-mail

7    that the cogeneration systems were failing due to engine problems.  Hess responded by e-mail that

8    it took DG Cogen's complaint "very seriously" and, on or about September 21, 2004, represented

9    in writing that it would undertake a replacement program to retrofit all of the engine heads in the

10    DG Cogen fleet by December 2004.  Hess reiterated this promise during a meeting with DG

11    Cogen, which took place on or about September 22, 2004.

12        22.    Hess failed to retrofit the engines as promised.  On January 13, 2005, DG Cogen

13    met again with Hess to discuss the engine head failures.  At that time, DG Cogen explained in

14    detail how the engine head failures and other defects were causing substantial damage to DG

15    Cogen's business operations.  Subsequently, DG Cogen sent Ellen Smith, Hess Microgen's

16    President, a DG Cogen internal memorandum that detailed the substantial detrimental effect that

17    the failure of the cogeneration systems to operate as represented had on DG Cogen's business

18    operations.  DG Cogen followed this communication with a request for an in-person meeting with

19    Hess and Daewoo to discuss the engine head replacement program.

20        23.    On or about March 16, 2005, DG Cogen again met with Hess regarding the engine

21    head replacement program, and Hess again promised to retrofit the entire fleet of cogeneration

22    units with Daewoo 12000 series engine heads, which it represented would address the problems

23    the units had been experiencing.  DG Cogen relied on the purported expertise of Hess that the

24    Daewoo 12000 series heads would remedy the problems.  Hess promised to begin the retrofit at the

25    end of March 2005 and to complete it before the end of Summer 2005.  Yet, Hess failed to

26    undertake the retrofit program pursuant to that timeline.  As a result, DG Cogen sought further

27    assurances from Hess, through its upper management, including Hess Microgen President Ellen

28    Smith, that Hess would retrofit the fleet as promised.

COMPLAINT; DEMAND FOR JURY TRIAL

1    24.    On May 18, 2005, Hess Microgen President Ellen Smith told DG Cogen in an e-

2  mail that Hess would "baseline" the DG Cogen fleet of cogeneration systems by mid-July 2005 so

3  that Hess could perform the 12000 engine head replacement program on DG Cogen's fleet.  DG

4  Cogen justifiably relied on Hess' representations that the units would be repaired to bring them in

5  line with the warranted and represented specifications and that the 12000 series engine head

6  retrofit was the way to accomplish that.

7    25.    While DG Cogen was waiting for Hess to undertake the promised work, DG Cogen

8  extensively documented the failures in the units.  For instance, on or about May 16, 2005, DG

9  Cogen told Hess in an e-mail that 29 of 56 cogeneration systems were down for at least a month.

10  On or about May 27, 2005, DG Cogen notified Hess in an e-mail that 85% of the units installed in

11  Los Angeles were down and that "[t]he financial impact to DG is very real and substantial."

12    26.    On or about July 12, 2005, representatives of Hess, Daewoo, and DG Cogen met in

13  person to discuss the problems with the systems.  During this meeting, DG Cogen learned for the

14  first time, through statements made by an engineering executive at Daewoo, that the Daewoo

15  engines in the Hess cogeneration systems, including those purchased by DG Cogen, were designed

16  to be "lean burn" engines and that Hess, though aware of that fact, packaged, represented,

17  advertised and sold the systems as having "rich burn" engines.  This misrepresentation explained

18  why the engines had been failing to operate to specification or at all.  Had DG Cogen known that

19  the engines were designed to be "lean burn," it would not have purchased the units or entered into

20  any related service agreement with Hess.

21    27.    Soon after the meeting on July 12, 2005, DG Cogen requested that Hess test the

22  power output of each cogeneration unit to further confirm that the output of the units failed to meet

23  specifications, but Hess failed to perform the requested testing.  Instead, on July 26, 2005, Hess

24  notified DG Cogen that Hess would no longer service the units.  As a result, DG Cogen was forced

25  to shut down the units for safety reasons, resulting in significant losses and damages to DG Cogen,

26  including loss of revenue from its customer leases.

27    28.    Given Hess' failure and refusal to remedy the problems with the systems, in early

28  2006, DG Cogen attempted to service the failed cogeneration units itself.  Toward that end, DG

8

COMPLAINT; DEMAND FOR JURY TRIAL

1  Cogen sent a formal request to Hess, requesting that Hess provide DG Cogen with the Daewoo
2  12000 series engine heads that DG Cogen understood had been supplied to Hess by Daewoo for
3  purposes of the DG Cogen fleet retrofit that had been promised by Hess.

4         29.    In response to DG Cogen's request, on February 28, 2006, Hess abandoned its
5  promises, refused to provide the engine heads and instead "recommended" that DG Cogen contact
6  Daewoo to obtain the heads directly.

7         30.    As a result of Hess' failure to provide the heads as repeatedly promised, DG Cogen
8  was left with no choice but to obtain replacement heads directly from Daewoo. When DG Cogen
9  contacted Daewoo to obtain the equipment; however, Daewoo represented to DG Cogen that the
10 12000 series heads had been superseded by a 13000 series head and that the 13000 series heads
11 were the equipment DG Cogen needed to address the problems with the Hess units. In justifiable
12 reliance on Daewoo's purported technical expertise, DG Cogen purchased 13000 series heads from
13 Daewoo, through Advanced Power. *See* Exhibit C. In selling DG Cogen the 13000 series engine
14 heads, Daewoo was aware of the problems the Hess units had been experiencing and was aware of
15 DG Cogen's intended use of the heads. Daewoo represented that the heads it sold to DG Cogen
16 would meet DG Cogen's needs and would remedy the operational problems with the cogeneration
17 systems.

18        31.    Despite Daewoo's representations that the 13000 series heads would remedy the
19 problems, the engine head retrofit kits failed to correct the problems with the DG Cogen
20 cogeneration systems. Those engine heads still fail to work as of the time of the filing of this
21 action, despite subsequent modifications to the heads by Daewoo. As a result of the engine and
22 other operational failures with the units, the cogeneration systems now sit idle on the leased
23 properties, resulting in significant losses and damages to DG Cogen.

24        32.    As a result of the defects and failures of the Hess cogeneration systems and the
25 Daewoo engine heads, the misrepresentations made by Defendants, and the other wrongful acts
26 and omissions of Defendants, DG Cogen has suffered, and continues to suffer, losses and damages,
27 including but not limited to the purchase price of the units, the cost of installing and/or removing
28 the units, amounts expended in service and maintenance of the units and retrofit parts, the cost of

9

1    the Daewoo retrofit kits, lost revenues and profits, and other business losses, including related to

2    the leases with DG Cogen's customers, attorneys' fees and costs, interest, and other general and

3    special damages, to be proven at trial.

4                                **FIRST CLAIM FOR RELIEF**

5          **(Unfair Competition and False Advertising under the Lanham Act against Hess)**

6          33.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 32,

7    above.

8          34.    Hess is in the business of leasing, installing and operating cogeneration systems,

9    including in the State of California, in competition with DG Cogen.

10         35.    As detailed in this Complaint, Hess made false and misleading statements in

11   commercial advertising, on the Internet, and in technical documentation that misrepresented the

12   nature and quality of their products.

13         36.    Hess has engaged in false, misleading and deceptive business practices, in violation

14   of the Lanham Act, 15 U.S.C. § 1125(a), by falsely marketing their products to be able to perform

15   at certain represented specifications.

16         37.    As a result of Hess' unfair competition and false advertising, DG Cogen has

17   suffered, and continues to suffer, significant damages in an amount to be proven at trial.

18                               **SECOND CLAIM FOR RELIEF**

19                            **(Breach of Contract against Hess)**

20         38.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 37,

21   above.

22         39.    In or about December 2000, Hess and RealEnergy entered into the written Hess-

23   RealEnergy Contract, which is attached as Exhibit A and made a part of this Complaint.

24         40.    DG Cogen acquired all of RealEnergy's rights and interests under the Hess-

25   RealEnergy Contract, pursuant to a valid assignment, including "all rights, claims and causes of

26   action" related to the cogeneration units.  That valid assignment is reflected by a written agreement

27   between RealEnergy and DG Cogen, which is attached as Exhibit B and made a part of this

28   Complaint.  Hess also made numerous verbal promises to DG Cogen that it would remedy the

                                        10

1  defects in the cogeneration systems.

2      41.     DG Cogen has performed all conditions, covenants and promises required on its

3  part to be performed, to the extent its obligations have not been excused, frustrated or prevented by

4  the wrongful acts and omissions of Hess.

5      42.     Hess breached the Hess-RealEnergy Contract and its verbal promises by failing to

6  provide cogeneration systems that met the descriptions and specifications as represented and

7  warranted by Hess and by failing to remedy the defects in the systems.  Among other things, the

8  systems were defective, were not "rich burn" and did not operate at an output of at least 192kWH

9  on natural gas.

10     43.     Despite repeated requests by DG Cogen, Hess has failed and refused to perform its

11  obligations under the contract or its other promises.

12     44.     As a result of Hess' breach of contract, DG Cogen has suffered, and continues to

13  suffer, significant damages in an amount to be proven at trial.

14                          **THIRD CLAIM FOR RELIEF**

15           **(Breach of Contract against Doosan/Daewoo and Advanced Power)**

16     45.     DG Cogen incorporates by reference the allegations of Paragraphs 1 through 44,

17  above.

18     46.     Beginning by at least July 2006, DG Cogen entered into valid written agreements

19  for the purchase and sale of Daewoo 13000 series engine heads, for the purposes of retrofitting the

20  Hess cogeneration systems in DG Cogen's fleet.  DG Cogen purchased those engine heads from

21  Daewoo through Advanced Power.  The purchase orders evidencing the written agreements

22  between DG Cogen and Daewoo and Advanced Power are attached collectively as Exhibit C and

23  made a part of this Complaint.  Daewoo and Advanced Power also made verbal promises to DG

24  Cogen regarding the nature, quality and uses of the engine heads.

25     47.     DC Cogen has performed all conditions, covenants and promises required on its

26  part to be performed, to the extent its obligations have not been excused, frustrated or prevented by

27  Daewoo and/or Advanced Power.

28     48.     Daewoo and Advanced Power breached the contracts with DG Cogen and their

                                  11

1  verbal promises in that the 13000 series engine heads were defective and failed to perform as

2  represented and warranted.

3       49.    As a result of the breach of the contracts by Daewoo and Advanced Power, DG

4  Cogen has suffered, and continues to suffer, significant damages in an amount to be proven at trial.

5          **FOURTH CLAIM FOR RELIEF**

6       **(Breach of Implied Covenant of Good Faith and Fair Dealing against Hess)**

7       50.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 49,

8  above.

9       51.    In the Hess-RealEnergy Contract there was an implied covenant of good faith and

10  fair dealing that neither party would do anything to injure, frustrate or interfere with the rights of

11  the other party to receive the benefits of the contract. DG Cogen is the valid assignee of that

12  promise.

13       52.    Hess breached its duty of good faith and fair dealing by, among other things,

14  making false statements about the reliability and functionality of the Hess cogeneration systems,

15  fraudulently inducing RealEnergy to enter into the Hess-RealEnergy Contract, fraudulently

16  inducing DG Cogen to accept an assignment of RealEnergy's rights and interests under that

17  contract, and consciously and deliberately refusing to perform the acts required of it under the

18  contract, thereby depriving DG Cogen of the benefits under the contract.

19       53.    As a result of Hess' breach of the implied covenant of good faith and fair dealing,

20  DG Cogen has suffered, and continues to suffer, significant damages in an amount to be proven at

21  trial.

22          **FIFTH CLAIM FOR RELIEF**

23    **(Breach of Implied Covenant of Good Faith and Fair Dealing against Doosan/Daewoo and**

24          **Advanced Power)**

25       54.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 53,

26  above.

27       55.    In the contracts for sale between DG Cogen and Daewoo and Advanced Power,

28  there was an implied covenant of good faith and fair dealing that neither party would do anything

12

COMPLAINT; DEMAND FOR JURY TRIAL

1    to injure, frustrate or interfere with the rights of the other party to receive the benefits of the

2    contract.

3        56.    Daewoo and Advanced Power breached their duties of good faith and fair dealing

4    by, among other things, making false statements about the reliability and functionality of the

5    Daewoo 13000 series engine heads, fraudulently inducing DG Cogen to enter into the purchase

6    contracts, and providing defective equipment, thereby depriving DG Cogen of the benefits under

7    the contracts.

8        57.    As a result of the breach of the implied covenant of good faith and fair dealing by

9    Daewoo and Advanced Power, DG Cogen has suffered, and continues to suffer, significant

10    damages in an amount to be proven at trial.

11                    **SIXTH CLAIM FOR RELIEF**

12                **(Breach of Express Warranty against All Defendants)**

13        58.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 57,

14    above.

15        59.    Defendants made express verbal and written warranties about the quality and

16    performance of the Hess cogeneration systems and the Daewoo engine heads, specifically

17    including that the units were "rich burn" and would operate at the rated capacity of at least

18    192kWH using natural gas and that the Daewoo engines would work successfully with the Hess

19    cogeneration systems.

20        60.    Defendants breached the express warranties, as the cogeneration systems and

21    engine heads did not function as represented by Defendants.

22        61.    DG Cogen notified Defendants of the breach of the express warranties on repeated

23    occasions; yet, Defendants failed and refused to remedy the breaches.

24        62.    As a result of Defendants' breaches of express warranties, DG Cogen has suffered,

25    and continues to suffer, significant damages in an amount to be proven at trial.

26                    **SEVENTH CLAIM FOR RELIEF**

27    **(Breach of Implied Warranty of Fitness for a Particular Purpose against All Defendants)**

28        63.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 62,

13

COMPLAINT; DEMAND FOR JURY TRIAL

1  | above.

2  |     64.    Defendants knew that the purpose for which DG Cogen intended to use the

3  | cogeneration systems and engine heads was to generate electricity and heat, using natural gas, for

4  | sale to commercial property owners. Defendants represented to DG Cogen, in inducing DG Cogen

5  | to purchase the cogeneration systems and engines, that the equipment would perform for that

6  | particular purpose. DG Cogen relied on the purported expertise of Defendants in entering into the

7  | agreements to purchase the equipment.

8  |     65.    The repeated underperformance and failures of the cogeneration systems, including

9  | after being retrofit with the Daewoo 13000 series engine heads, and of the engine heads render the

10 | equipment unfit for the particular purpose for which it was intended. The problems with the

11 | systems and engines were not the result of any abnormal or unique use of the systems or engines.

12 |     66.    DG Cogen notified Defendants of the breach of the implied warranty of fitness for a

13 | particular purpose on repeated occasions; however, Defendants failed and refused to remedy.

14 |     67.    As a result of Defendants' breach of the implied warranty of fitness for a particular

15 | purpose, DG Cogen has suffered, and continues to suffer, significant damages in an amount to be

16 | proven at trial.

17 | **EIGHTH CLAIM FOR RELIEF**

18 | **(Breach of Implied Warranty of Merchantability against All Defendants)**

19 |     68.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 67,

20 | above.

21 |     69.    The Hess cogeneration systems and Daewoo engine heads that DG Cogen

22 | purchased were not merchantable and were not fit for the ordinary purpose for which such

23 | equipment is used, i.e. the generation of heat and electricity according to operational

24 | specifications.

25 |     70.    DG Cogen notified Defendants of the breach of the implied warranty of

26 | merchantability on repeated occasions; however, Defendants failed and refused to remedy.

27 |     71.    As a result of Defendants' breach of the implied warranty of merchantability, DG

28 | Cogen has suffered, and continues to suffer, significant damages in an amount to be proven at trial.

14

COMPLAINT; DEMAND FOR JURY TRIAL

1

## NINTH CLAIM FOR RELIEF

2

### (Unconscionability against All Defendants)

3      72.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 71,

4   above.

5      73.    To the extent that any provisions in the agreements between DG Cogen and any of

6   the Defendants purport to limit or restrict DG Cogen's right to recovery of damages, those

7   provisions are unconscionable and unenforceable.

8

## TENTH CLAIM FOR RELIEF

9

### (Fraud against All Defendants)

10      74.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 73,

11   above.

12      75.    As detailed in this Complaint, Defendants' verbal and written representations that

13   the Hess cogeneration systems and Daewoo engine heads would perform according to the

14   represented specifications were false. Among other things: (1) Defendants knew, but concealed

15   the fact, that the Daewoo engines packaged with the Hess cogeneration systems were "lean burn"

16   and not "rich burn" as represented; (2) Defendants packaged and marketed the systems as "rich

17   burn," despite knowledge that the systems were not; (3) Defendants represented that the systems

18   would operate at an output of at least 192kWH on natural gas; (4) Defendants represented that the

19   systems, including the engines, were not defective; and (5) Defendants represented that retrofit of

20   the engines would successfully remedy the performance and operational problems with the

21   systems.

22      76.    Defendants made these representations with knowledge that they were false and

23   with the intent to deceive and defraud DG Cogen and to induce DG Cogen to act in reliance on the

24   representations.

25      77.    At the time the representations were made by Defendants, DG Cogen was ignorant

26   of the falsity of the representations and believed them to be true. In justifiable reliance on the

27   representations, DG Cogen was induced to enter into the contracts and undertake the other actions

28   referenced in this Complaint. Had DG Cogen known the truth, it would not have entered into the

1    contracts or taken such action.

2        78.    As a result of the fraud committed by Defendants, DG Cogen has suffered, and

3    continues to suffer, significant damages in an amount to be proven at trial.

4        79.    Defendants' conduct was done with intentional disregard of DG Cogen's rights and

5    with oppression, fraud and malice, entitling DG Cogen to exemplary and punitive damages.

6    **ELEVENTH CLAIM FOR RELIEF**

7    **(Fraudulent Inducement against All Defendants)**

8        80.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 79,

9    above.

10        81.    As detailed in this Complaint, Defendants knowingly made false and misleading

11    verbal and written representations to DG Cogen about the nature and quality of the Hess

12    cogeneration systems and the Daewoo engine heads, to induce DG Cogen to purchase that

13    equipment on the terms and conditions contained in the contracts referenced in this Complaint.

14        82.    As a result of Defendants' fraudulent inducement, DG Cogen has suffered, and

15    continues to suffer, significant damages in an amount to be proven at trial.

16        83.    Defendants' conduct was done with intentional disregard of DG Cogen's rights and

17    with oppression, fraud and malice, entitling DG Cogen to exemplary and punitive damages.

18    **TWELFTH CLAIM FOR RELIEF**

19    **(Negligent Misrepresentation against All Defendants)**

20        84.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 83,

21    above.

22        85.    As detailed in this Complaint, Defendants' verbal and written representations that

23    the Hess cogeneration systems and Daewoo engine heads would perform according to the

24    represented specifications were made without any reasonable ground for believing them to be true.

25

26        86.    Defendants made the representations with the intent to deceive and defraud DG

27    Cogen and to induce DG Cogen to act in reliance on the representations.

28        87.    At the time the representations were made by Defendants, DG Cogen was ignorant

16

1   of the falsity of the representations and believed them to be true.  In justifiable reliance on the

2   representations, DG Cogen was induced to enter into the contracts and undertake the other actions

3   referenced in this Complaint.  Had DG Cogen known the truth, it would not have entered into the

4   contracts or taken such action.

5          88.     As a result of Defendants' negligent misrepresentations, DG Cogen has suffered,

6   and continues to suffer, significant damages in an amount to be proven at trial.

7          89.     Defendants' conduct was done with reckless disregard of DG Cogen's rights and

8   with oppression, fraud and malice, entitling DG Cogen to exemplary and punitive damages.

9                              **THIRTEENTH CLAIM FOR RELIEF**

10                **(Tortious Interference with Contract against Hess)**

11         90.     DG Cogen incorporates by reference the allegations of Paragraphs 1 through 89,

12  above.

13         91.     Hess knew of the existence of DG Cogen's leases with commercial property owners

14  in San Francisco and other parts of California, for the sale of the energy and heat generated by the

15  Hess cogeneration plants.  In fact, Hess met with and provided assurances to a number of those DG

16  Cogen customers, with respect to the functionality of the systems.

17         92.     As a direct result of Hess' breach of the Hess-RealEnergy Contract, its false

18  representations and assurances to DG Cogen and DG Cogen's customers regarding the Hess

19  cogeneration systems, and its failure and refusal to provide services to DG Cogen or to remedy the

20  problems with the cogeneration systems as promised, Hess knowingly disrupted DG Cogen's

21  contractual relationships with its customers.  As a result, DG Cogen has suffered, and continues to

22  suffer, significant damages in an amount to be proven at trial.

23                              **FOURTEENTH CLAIM FOR RELIEF**

24       **(Intentional Interference with Prospective Economic Advantage against Hess)**

25         93.     DG Cogen incorporates by reference the allegations of Paragraphs 1 through 92,

26  above.

27         94.     Hess knew of the existence of DG Cogen's leases with commercial property owners

28  in San Francisco and other parts of California, for the sale of the energy and heat generated by the

COMPLAINT; DEMAND FOR JURY TRIAL

1    Hess cogeneration plants. In fact, Hess met with and provided assurances to a number of those DG

2    Cogen customers, with respect to the functionality of the systems.

3        95.    As a direct result of Hess' breach of the Hess-RealEnergy Contract, its false

4    representations and assurances to DG Cogen and DG Cogen's customers regarding the Hess

5    cogeneration systems, and its failure and refusal to provide services to DG Cogen or to remedy the

6    problems with the cogeneration systems as promised, Hess knowingly disrupted DG Cogen's

7    relationships with its customers. As a result, DG Cogen has suffered, and continues to suffer,

8    significant damages in an amount to be proven at trial.

9                    **FIFTEENTH CLAIM FOR RELIEF**

10        **(Negligent Interference with Prospective Economic Advantage against Hess)**

11        96.    DG Cogen incorporates by reference the allegations of Paragraphs 1 through 95,

12    above.

13        97.    Hess knew of the existence of DG Cogen's leases with commercial property owners

14    in San Francisco and other parts of California, for the sale of the energy and heat generated by the

15    Hess cogeneration plants. In fact, Hess met with and provided assurances to a number of those DG

16    Cogen customers, with respect to the functionality of the systems.

17        98.    As a direct result of Hess' breach of the Hess-RealEnergy Contract, its false

18    representations and assurances to DG Cogen and DG Cogen's customers regarding the Hess

19    cogeneration systems, and its failure and refusal to provide services to DG Cogen or to remedy the

20    problems with the cogeneration systems as promised, Hess disrupted DG Cogen's relationships

21    with its customers. It was reasonably foreseeable to Hess that this wrongful conduct would

22    interfere with or disrupt the economic relationships between DG Cogen and its customers. As a

23    result, DG Cogen has suffered, and continues to suffer, significant damages in an amount to be

24    proven at trial.

25                        **PRAYER FOR RELIEF**

26        WHEREFORE, DG Cogen respectfully prays for judgment against Defendants, as follows:

27        1.    General and special damages, in an amount to be determined at trial;

28        2.    Exemplary and punitive damages, in an amount to be determined at trial;

18

1        3.    Voidance of any contract provision purporting to limit DG Cogen's right to

2  recovery;

3        4.    Attorney's fees and costs of suit incurred herein;

4        5.    Interest as provided by law; and

5        6.    Such other and further relief as this Court deems just and proper.

6

7        Dated:  July 3, 2008            KING & SPALDING LLP

8

9                                 BRENDA N. BUONAIUTO

10                            Attorneys for Plaintiff

                                   DG COGEN PARTNERS, LLC

11

12

13                     **DEMAND FOR JURY TRIAL**

14       Plaintiff DG Cogen Partners, LLC hereby demands a trial by jury of all facts and issues

15  in this action so triable.

16

17        Dated:  July 3, 2008            KING & SPALDING LLP

18

19                                 BRENDA N. BUONAIUTO

20                            Attorneys for Plaintiff

21                            DG COGEN PARTNERS, LLC

22

23

24

25

26

27

28

COMPLAINT; DEMAND FOR JURY TRIAL

**EXHIBIT A**

PREFERRED SUPPLIER AGREEMENT

This Preferred Supplier Agreement is made as of December __, 2000, by and between Hess Microgen LLC, a Delaware limited liability company having an office at 1 Hess Plaza, Woodbridge, NJ 07095 ("Hess") and RealEnergy, a Delaware limited liability company having an office at 1900 Avenue of the Stars – Suite 755, Los Angeles, CA 90067 ("RealEnergy"), collectively the "Parties" or individually a "Party."

WHEREAS Hess is a manufacturer and assembler of micro-generation and micro-cogeneration equipment, and provides engineering and operating services in conjunction therewith; and

WHEREAS Hess is desirous of selling its systems to RealEnergy for use in servicing investors and customers and providing business opportunities for micro-generation and micro-cogeneration applications; and

WHEREAS RealEnergy is capable of marketing and operating such applications; and

WHEREAS the Parties are desirous of working together to meet their mutual objectives.

NOW, THEREFORE the Parties agree as follows.

1.    Hess will sell it products listed on Schedule "A" (the "Products") to RealEnergy for use in connection with its investors and customers, as listed on Schedule "B" (collectively "Customers"). Except as set forth below, or if RealEnergy is referred or contacts a Customer and decides not to offer such Customer the Products, Hess hereby agrees not to directly market or sell Products to Customers for the term of this Agreement, provided that RealEnergy can demonstrate to Hess that at least fifty (50%) percent of its requirements (based upon contracts to sell or installations) for microgeneration units, measured in kW of nameplate output, of systems installed that are between 100 kW and 1,000 kW in total system nameplate output, for the previous six-month period have been purchased from Hess pursuant to this Agreement. If any Customers contact Hess, while this provision is in effect, then Hess shall, unless otherwise agreed to by RealEnergy, direct such inquiries to RealEnergy.

2.    Nothing herein will prevent Hess from selling, leasing, or installing units (with or without energy sales or management agreements associated therewith) to anyone not listed on Schedule B. Nothing herein will prevent Hess from selling, leasing, or installing units (with or without energy sales or management agreements associated therewith) to existing customers or to national accounts which Hess, its parent or any of its affiliates, now has or may develop in the future, so long as such national accounts are not procured substantially through the efforts of RealEnergy. RealEnergy will not be entitled to any economic benefit in

connection with the transactions described in the preceding two sentences, unless the Parties agree otherwise in writing.

3      Hess will establish a price list for Products to be sold hereunder and Hess reserves the right to revise such price lists upon thirty (30) days written notice to RealEnergy. The initial price list is attached hereto as Schedule "A" Notwithstanding the foregoing, Hess agrees that the prices in Schedule A will not be increased by an amount greater than 2.5% per item during the first year of the Agreement. Further, RealEnergy will receive the price benefit on orders placed after a Hess sale of Products to an independent third-party, other than RealEnergy, if Hess' retail price for an identical Product sold to a Hess' real estate sector client is lower than set forth on Schedule A (after consideration of any energy sales and management agreements sold therewith). RealEnergy may purchase the Products for its own use or may offer them for resale to customers in connection with energy sales or management agreements.

4.     This Agreement will be effective upon execution by the Parties, and will continue for a period of three (3) years from the date of execution, unless terminated earlier pursuant to the provisions of Sections 5, 14 or 16.

5.     This Agreement may be terminated at any time upon agreement of the parties in writing. It may also be terminated by Hess, upon ten (10) business days notice to RealEnergy, if RealEnergy fails to purchase and pay for at least 20 Products (constituting an entire module and not including replacement parts) within the first or second six-month period following the date of this Agreement, or failure to meet any subsequent quota amount for any succeeding six-month period. On each anniversary of this Agreement, the parties will agree upon minimum purchase requirements for the next two six-month periods of the Agreement. If the agreement is not terminated and the parties fail to agree upon a new quota, then the minimum purchase requirements of 20 units for each six-month period thereafter will apply.

6.     Upon any event of termination precipitated by RealEnergy's failure to meet its minimum purchase requirement, however, Hess and RealEnergy continue to honor provisions seven (7) through twenty-five (25) herein.

7.     RealEnergy is an independent contractor and no agency is created hereby. RealEnergy will have, at no time, any right, title or agency to bind Hess to any agreement, promise or condition.

8.     RealEnergy, unless authorized in writing by Hess, is not permitted to use any trademark, service mark, trade secret, design, production drawing, mechanical compilation or other intellectual property of Hess without the written consent of Hess, except that RealEnergy may distribute promotional materials displaying the Products which bear the name and logo of Hess. RealEnergy agrees not to reverse engineer, decompile or otherwise disclose the design of the Products during the term of this Agreement. RealEnergy will use commercially reasonable efforts to promote use of the Products in order to fulfill the minimum purchase requirements hereunder. RealEnergy agrees to maintain sufficient personnel, offices and systems to maximize this effort. RealEnergy and Hess agree to meet to negotiate on the subject of whether and on what terms RealEnergy could have the right to private label Product with RealEnergy's support systems with the

RealEnergy name and logo, except that such agreement is not a condition of this Agreement.

9. Hess provides certain services in connection with the sale of Products. Those services may include installation of Products, engineering services, or other related activities. The Parties may agree, on a case-by-case basis, in addition to the sale of Products, to have Hess perform services for RealEnergy or RealEnergy's customers. The terms of providing such services will be contained in separate agreements.

10. RealEnergy and Hess agree herewith to, at all times, comply with any and all applicable federal, state, county, municipal and local statutes, laws, rules, ordinances, regulations, and codes, as well as with any and all equal opportunity requirements, and in compliance with any and all reasonable rules of which RealEnergy is apprised in writing and that do not unreasonably interfere with RealEnergy's ability to fulfill its obligations under this Agreement (collectively, the foregoing hereinafter are referred to as "Laws and Standards").

11. RealEnergy will maintain appropriate liability insurance for its business activities. RealEnergy will defend, indemnify and hold Hess harmless from any and all claims, demands, suits or liability arising out of any acts or omissions of RealEnergy, its employees, appointees, legal representatives and agents, whether based upon breach of contract, negligence, strict liability or otherwise.

12. Hess will be adequately self-insured, through its parent, Amerada Hess Corporation, or will maintain appropriate liability insurance for its business activities. Hess will defend, indemnify and hold RealEnergy harmless from any and all claims, demands, suits or liability arising out of any acts or omissions of Hess, its employees, appointees, legal representatives and agents, whether based upon breach of contract, negligence, strict liability or otherwise.

13. RealEnergy and Hess will avoid activities or practices that may injure the reputation of the other party or its Products.

14. If, pursuant to this Agreement, one Party discloses to the other Party data or information, or information or data is developed in connection with this Agreement, RealEnergy and Hess will retain such data or information as confidential and in strict confidence and not use it or disclose it except as expressly agreed in writing by the other or except if and to the extent that it becomes generally known through no fault of the other Party.

15. Orders will be binding upon Hess only when accepted and approved in writing by an authorized representative of Hess. Hess will have the right to accept or reject any order, or to accept part of any order and to reject the balance. All such orders will be for delivery f.o.b. (Carson City, Nevada) and will be subject to Hess' standard terms and conditions in effect as of date of shipment, except for the payment terms which are as follows: RealEnergy will pay a deposit of 20% of the sales price when placing the order for the Products and an additional 50% of the total price, including all taxes, upon delivery. Hess will invoice RealEnergy for the balance when the unit is delivered with payment due within 30 days of receipt of invoice. Any taxes due on the sale of the unit will be separately listed on the invoice. RealEnergy will have no rights of set-off against the purchase price of the Products, and Hess will have no obligation to provide any services with regard

to unpaid Products. If RealEnergy has any payment due to Hess, which is more than fifteen days overdue, then Hess may suspend deliveries of any Products ordered until all past due amounts are paid in full, following two events whereby RealEnergy has been more than thirty days late in payment, Hess may thereafter require prepayment in full in order to release suspended deliveries. If any payment due to Hess is more than sixty days overdue, then Hess may declare this Agreement in default, and may terminate this Agreement on ten days written notice, unless RealEnergy cures such default within ten days of receipt of written notice of such default.

16. No liability will result from the delay in performance or nonperformance (other than the obligation to pay for Products shipped) caused by force majeure or circumstances beyond the reasonable control of the party affected, including, but not limited to, Acts of God, fire, flood, war, embargo, any United States or State government regulation, direction or request, accident, labor trouble, or shortage of, or inability to obtain material, equipment, or transport.

17. If RealEnergy or Hess enters or is placed in bankruptcy, receivership or liquidation, becomes insolvent, makes an assignment for the benefit of its creditors, or is, in the Party's reasonable opinion financially impaired and unable to perform its obligations hereunder in full, then the other Party may terminate this Agreement immediately upon written notice.

18. Neither Party, by reason of the termination or expiration of this Agreement in conformity with the terms thereof or the non-renewal of this Agreement for any or all of the Products, will be liable to the other party for compensation, reimbursement or damages because of the loss of goodwill, anticipated sales or prospective profits, or because of expenditures, investments or other matters related to the performance hereunder or to the business of the parties.

19. The construction, performance and completion of this Agreement will be governed by the laws of THE STATE OF NEW YORK without regard to conflicts of laws provisions.

20. Except as otherwise provided herein, neither Party may assign this Agreement or any right or obligation under this Agreement and any purported assignment is void. Hess may assign its rights and delegate its performance hereunder, in whole or in part, to any affiliated company or to any successor in interest or transferee of that portion of Hess's business that is directly involved in the performance of this Agreement. RealEnergy may assign its rights and delegate its performance to an entity with at least the same operating capabilities as existed at the time of the assignment.

21. This Agreement may be executed in duplicates, but will not be binding upon Hess until a copy, signed by RealEnergy, is executed by Hess.

22. This Agreement supersedes any existing agreements or arrangements by and between Hess and RealEnergy relating to the subject matter hereof, whether written or oral, and all such prior agreements or arrangements are hereby deemed terminated.

23. Attached as "Exhibit C" is Hess' limited product warranty for generation units, which will apply to all sales of Products made hereunder. **ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED**

WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ARE EXCLUDED. Neither Party will be liable to the other Party for lost business or profits or consequential or incidental damages arising from a claim made under this Agreement.

24.   RealEnergy will advise Hess of the location of the installation and Hess will provide or cause to be provided additional services and equipment, at an agreed upon cost, to cause the Products to be permitted to commence operations in compliance with federal, state and local air quality and utility interconnection requirements, provided that the Products are not modified by RealEnergy and are installed in compliance with Hess' directions and the requirements of local law.

25.   For a all installations in the State of California, RealEnergy will advise Hess of the location of the installation and Hess will provide or cause to be provided any additional services and/or equipment, at such cost as identified in the invoice for suh system, to cause the Products to be permitted to commence operations in compliance with federal, state and local air quality requirements, provided that the Products are not modified by RealEnergy and are installed in compliance with Hess' directions and the requirements of local law. All systems ordered by RealEnergy for installation in the State of California shall be ordered with all required systems necessary for compliance with local, state and federal air quality requirements.

26.   Any notice required or permitted herein may be hand delivered, sent via nationally recognized overnight delivery service, or mailed, properly addressed to the Party to be notified at the address set forth above or at the last known address given by such Party to the other Party, and is deemed delivered when so transmitted, except that delivery by regular mail is deemed delivered three days after deposit into the U.S.P.S.

In witness whereof, the Parties hereto have executed this Agreement as of the Effective Date.


_____                    _____
RealEnergy LLC                                                   Hess Microgen LLC
By:                                                             By:
Title:                                                          Title:

PREFERRED SUPPLIER AGREEMENT
AMENDMENT 1

Whereas on December ___, 2000, a Preferred Supplier Agreement was entered into by and between Hess Microgen LLC, a Delaware limited liability company having an office at 1 Hess Plaza, Woodbridge, NJ 07095 ("Hess") and RealEnergy, a Delaware limited liability company having an office at 1900 Avenue of the Stars – Suite 755, Los Angeles, CA 90067 ("RealEnergy"), collectively the "Parties" or individually a "Party."

WHEREAS RealEnergy desires to secure the manufacture and delivery of a specific schedule of products manufactured by Hess

NOW, THEREFORE the Parties agree as follows.

1.   Hess will agree to manufacture for RealEnergy, as outlined on the attached Exhibit A, twelve (12) Hess Microgen 200 kW systems for immediate delivery and an additional one hundred twenty four (124) Hess Microgen 200 kW systems for delivery in accordance with the schedule outlines on Exhibit A.

2.   In consideration for the above secured delivery positions, RealEnergy will, herewith, provide Hess Microgen with deposits totaling $252,000 or twenty percent (20%) of the purchase price for the twelve (12) units to be immediately delivered and an additional deposit of $248,000, or $2,000.00 per unit, for the additional one hundred twenty four (124) units to be delivered in accordance with the schedule on Exhibit A.

3.   It is mutually understood and agreed that Hess will guarantee RealEnergy these preferred production positions in exchange for the above mentioned deposits.

4.   For the units which are being manufactured for immediate delivery, RealEnergy shall make such additional payments as called for in the Preferred Supplier Agreement. For other units which are the subject of this advance manufacturing position agreement, RealEnergy shall make an additional deposit sufficient to bring the total deposit for each unit to an amount equal to twenty percent (20%) within thirty days of notice that Hess has commenced the manufacture of said unit(s).

5.   RealEnergy may elect at any time prior to March 31, 2001, to apply the deposits for units not yet built to the cost of units purchased. Notwithstanding the foregoing, if RealEnergy chooses to apply said deposits, RealEnergy shall lose the right to control such production positions.

In witness whereof, the Parties hereto have executed this Agreement as of the Effective Date.

_____
RealEnergy LLC
By: *PHILLE SUYE*
Title: *PRESIDENT*

_____
Hess Microgen LLC
By: *SENIOR VICE PRESIDENT*
Title:

**EXHIBIT B**

Execution Copy

ASSET PURCHASE AGREEMENT

By and Among

DG COGEN PARTNERS, LLC,

REALENERGY, INC.,

REALENERGY PROJECTS I, LLC

and

REALENERGY PROJECTS II, LLC

Dated as of April 27, 2004

1099836 9

## TABLE OF CONTENTS

Page

ARTICLE 1   DEFINITIONS ...........................................................................1
   1.01   Definitions ......................................................................1

ARTICLE 2   PURCHASE AND SALE OF ASSETS .................................6
   2.01   Transfer of Assets ...........................................................6
   2.02   Excluded Assets .............................................................8
   2.03   Obligations and Liabilities Assumed ...............................9
   2.04   Obligations and Liabilities Not Assumed ........................9
   2.05   Purchase Price; Closing Payment ..................................10
   2.06   Prorations ....................................................................11
   2.07   Allocation and Sales Tax ..............................................13
   2.08   Appointment of Seller's Representative ..........................13

ARTICLE 3   CLOSING ................................................................................13
   3.01   Time and Place of Closing .............................................13
   3.02   Deliveries by Sellers ....................................................14
   3.03   Deliveries by Buyer ......................................................15
   3.04   Conditions to Buyer's Obligations to Close ...................15
   3.05   Conditions to Sellers' Obligations to Close ...................16

ARTICLE 4   REPRESENTATIONS AND WARRANTIES OF SELLERS .................17
   4.01   Corporate Existence and Authority ...............................17
   4.02   No Conflicts; Consents .................................................17
   4.03   Organization and Standing ...........................................18
   4.04   Purchased Assets ..........................................................18
   4.05   Assigned Leases ...........................................................18
   4.06   Brokers ........................................................................19
   4.07   Litigation .....................................................................19
   4.08   Contract Rights ............................................................19
   4.09   Tax Matters ..................................................................19
   4.10   Permits ........................................................................21
   4.11   Compliance with Laws .................................................21
   4.12   Environmental Matters .................................................21
   4.13   Regulatory Matters .......................................................21
   4.14   Insurance .....................................................................21
   4.15   Employee Matters ........................................................22
   4.16   Customers and Suppliers ..............................................22
   4.17   Bulk Transfer ...............................................................22
   4.18   CapitalSource Consent ..................................................22
   4.19   Disclosure ....................................................................22
   4.20   Copies of Documents ....................................................22
   4.21   Disclaimer of Other Representations and Warranties; Disclosure .............22

                                                                                            Page

ARTICLE 5     REPRESENTATIONS AND WARRANTIES OF BUYER......................23
    5.01    Corporate Existence and Authority of Buyer ................................23
    5.02    No Conflicts; Consents.........................................................23
    5.03    Availability of Funds..........................................................24
    5.04    Acknowledgments by Buyer....................................................24
    5.05    Brokers...........................................................................24
    5.06    Litigation........................................................................24

ARTICLE 6     TRANSACTIONS PRIOR TO CLOSING ........................................24
    6.01    Access.............................................................................24
    6.02    Conduct Pending Closing .....................................................25
    6.03    Competing Transactions ......................................................25
    6.04    Confidentiality..................................................................25
    6.05    Consents...........................................................................25
    6.06    Public Announcements ........................................................26
    6.07    Cooperation......................................................................26
    6.08    Nonsolicitation..................................................................26
    6.09    Updating..........................................................................26
    6.10    Risk of Loss.....................................................................26
    6.11    Inventory.........................................................................27

ARTICLE 7     TERMINATION...................................................................28
    7.01    Termination......................................................................28
    7.02    Effect of Termination .........................................................28

ARTICLE 8     POST-CLOSING TRANSACTIONS .............................................29
    8.01    Access to Personnel and Books and Records ...............................29
    8.02    Access to Projects and Purchased Assets ...................................29
    8.03    Further Assurances ............................................................29
    8.04    Intellectual Property; Remote Monitoring Services; License of
            Certain Intellectual Property................................................30
    8.05    Corporate Identity .............................................................31

ARTICLE 9     MISCELLANEOUS................................................................31
    9.01    Survival of Representations and Warranties................................31
    9.02    Expenses and Fees .............................................................31
    9.03    Successors and Assigns .......................................................32
    9.04    Amendments......................................................................32
    9.05    Notices...........................................................................32
    9.06    Headings, Exhibits and Disclosure Schedules ..............................33
    9.07    Construction.....................................................................33
    9.08    Severability......................................................................33
    9.09    Governing Law...................................................................33
    9.10    Dispute Resolution..............................................................34
    9.11    Counterparts.....................................................................35
    9.12    No Consequential Damages....................................................35

Page

9.13    Entire Agreement..................................................................................35

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 27, 2004, is made by and among DG Cogen Partners, LLC, a Delaware limited liability company ("**Buyer**"), RealEnergy, Inc., a Delaware corporation ("**RealEnergy**"), RealEnergy Projects I LLC, a Delaware limited liability company ("**RE Projects I**"), and RealEnergy Projects II LLC a Delaware limited liability company ("**RE Projects II**"). RealEnergy, RE Projects I and RE Projects II shall each be referred to herein as a "**Seller**" and, collectively, as "**Sellers**."

WHEREAS, Sellers are engaged in the business of providing distributed generation systems and services, and in connection therewith own and operate the Projects;

WHEREAS, Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, the Purchased Assets, which are used in the Projects; and

WHEREAS, ArcLight Energy Partners Fund I, L.P., a Delaware limited partnership, is also executing this Agreement for the sole purpose of the guaranty provided above its signature on the signature page of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS

1.01    Definitions. As used herein, the following terms have the meanings set forth below:

"**AAA**" has the meaning set forth in Section 9.10(a).

"**Acquired Debt**" means all principal obligations outstanding on and accrued and unpaid interest through the Closing Date under (i) the Secured Term Promissory Note, dated as of November 22, 2002, made by RE Projects I, in favor of Government Capital Corporation (which has been assigned to FAB) and (ii) the Secured Term Promissory Note, dated as of August 29, 2003, made by RE Projects II, in favor of Government Capital Corporation (which has been assigned to FAB), which in no event shall exceed $16,763,426.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation**" has the meaning set forth in Section 2.07(a).

"**Applicable Law**" means any statute, law, rule or regulation of, or any order, judgment or decree, or ordinance of, or any published directive having the force of law, or any determination by, or interpretation of any of the foregoing, by any Governmental Body, to which a specified Person or its property is subject.

"**Arden Prepaid Access Fees**" has the meaning set forth in Section 2.01(j).

"**Assigned Leases**" has the meaning set forth in Section 2.01(b).

1099836 9

"**Beale Project**" means the Project identified as 50 Beale Street, San Francisco, California.

"**Business Day**" means any day other than Saturday, Sunday or a day on which banks are legally closed for business in the State of New York.

"**Buyer**" has the meaning set forth in the preamble.

"**Closing**" means the consummation of the purchase and sale of the Purchased Assets pursuant to this Agreement.

"**Closing Date**" means the date on which the Closing takes place, as set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986 and the Treasury Regulations promulgated thereunder, as amended, and interpreted as of the Closing Date, and all references to Treasury Regulations shall mean such regulations as they exist and are interpreted as of the Closing Date.

"**Competing Transaction**" means any (i) sale, lease, exchange, mortgage, pledge, transfer or other disposition of (x) a majority of the equity securities of any of the Sellers or (y) all or substantially all of the assets of any of the Sellers relating to the Projects in a single transaction or series of transactions; or (ii) merger, consolidation, recapitalization or business combination of or involving any of the Sellers.

"**Confidentiality Agreement**" means, collectively (i) the confidentiality agreement, dated November 24, 2003, between ArcLight Capital Holdings, LLC and Harris Williams & Co. and (ii) the confidentiality agreement, dated February 2, 2004, between DG Energy Solutions, LLC and Harris Williams & Co.

"**Continuing Interconnection Agreements**" has the meaning set forth in Section 8.06.

"**Contract Rights**" has the meaning set forth in Section 2.01(d).

"**Disclosure Schedule**" means the disclosure schedules attached to this Agreement.

"**Effective Time**" shall have the meaning set forth in Section 3.01.

"**Employee Benefit Plans**" means any contract, personnel policy, plan, program, practice, agreement, or other arrangement providing for compensation, loans, fringe benefits, equity or equity related awards (including stock options), cash bonuses, incentive awards, defined benefit retirement, defined contribution retirement, severance or termination pay, deferred compensation, executive compensation or supplemental income, Multiemployer Plan, Multiple Employer Plan, or any other employee benefit plan or program, to the extent that the foregoing generally apply to present or future directors, consultants employees or groups thereof.

- 2 -

"**Encumbrances**" means any lien, claim, charge, security interest, option, mortgage, pledge, limitations on voting rights, or other legal or equitable encumbrance.

"**Environmental Claim**" means any claim, action, demand, order, investigation or notice by or on behalf of any Governmental Body or other Person alleging potential liability based on or resulting from the violation of any Environmental Law or Permit granted under Environmental Law, or otherwise alleging any potential liability arising from the presence, emission, discharge or release of any material or substance regulated under Environmental Law.

"**Environmental Laws**" means any and all Applicable Laws pertaining to protection of the environment, natural resources, wildlife or public health and safety in effect in any and all jurisdictions in which any Seller or Project has conducted operations, including, without limitation, the Clean Air Act, as amended, CERCLA, the Federal Water Pollution Control Act, as amended, RCRA, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, and the Hazardous Materials Transportation Act, as amended.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that is treated as a "single employer" with either Seller pursuant to Section 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001(15) of ERISA.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.02</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.04</u>.

"**FAB**" means First American Bank, SSB, a Texas state savings bank.

"**FERC**" means the Federal Energy Regulatory Commission.

"**Fremont Project**" means the Project identified as 199 Fremont Street, San Francisco, California.

"**GIP**" has the meaning set forth in <u>Section 3.02(e)</u>.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency or instrumentality thereof, or any court or arbitrator, whether federal, state, local, foreign or otherwise.

"**Guaranties**" means, collectively, (i) the Guaranty of RealEnergy, Inc., dated as of November 22, 2002, made by RealEnergy in favor of FAB, and (ii) the Unconditional Guaranty of RealEnergy, Inc., dated as of August 29, 2003, made by RealEnergy in favor of FAB.

"**Hazardous Substance**" means any substance, material or waste that is regulated by or defined by any Environmental Law, including any material, substance or waste that is

defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," or "toxic substance" under any provision of applicable Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing-material or asbestos-containing-material, urea formaldehyde, radioactive materials and polychlorinated biphenyls.

"**Inventory**" has the meaning set forth in Section 2.01(i).

"**Licensed Intellectual Property**" has the meaning set forth in Section 8.04(c).

"**Lien Holdback**" has the meaning set forth in Section 2.05(b).

"**Litigation Holdback**" has the meaning set forth in Section 2.05(c).

"**Market Street Holdback**" has the meaning set forth in Section 2.05(d).

"**Market Street Project**" means the Project identified as 595 Market Street, San Francisco, California.

"**Material Adverse Effect**" means (i) any event, circumstance or condition materially impairing any Seller's authority, right, or ability to consummate the transactions contemplated by this Agreement; or (ii) any change (or changes taken together) or effect that is materially adverse to the business, operations, condition, value, ownership, revenue-generating capacity or physical condition of (A) the Beale Project or the Purchased Assets and the Purchased Liabilities relating to the Beale Project, (B) the Market Street Project or the Purchased Assets and the Purchased Liabilities relating to the Market Street Project, (C) the Fremont Project or the Purchased Assets and the Purchased Liabilities relating to the Fremont Project, or (D) the Remaining Projects or the Purchased Assets and the Purchased Liabilities relating to the Remaining Projects (taken together as a whole); provided, however, that Material Adverse Effect shall exclude any change, event or effect to the extent due to any of the following: (a) changes in utility rates and/or fuel costs, including, without limitation, non-bypassable utility charges, that are not within the control of any of the Sellers, (b) system outages to complete the Repairs set forth on Schedule 4.04(c), so long as each Seller uses commercially reasonable efforts to minimize any negative impact of such outages and complies with any requirement or provision of the Contract Rights, Permits and Applicable Law relating to a system outage or maintenance, and (c) the thermal pricing changes, retroactive to July 2003, on the Projects identified as 3200 Park Center Drive, Costa Mesa, California (Two Town) and 3111 Camino Del Rio, San Diego, California (Centerside), in accordance with the letter, dated April 21, 2004, between Commonwealth Management Services, LP and RealEnergy.

"**No Action Letter**" has the meaning set forth in Section 4.13.

"**Permits**" has the meaning set forth in Section 2.01(c).

"**Permitted Encumbrances**" has the meaning set forth in Section 4.04(b).

1099836.9

"**Person**" means an individual, corporation, partnership, trust, other entity or unincorporated organization or a government or any agency or political subdivision thereof.

"**Personal Property Leases**" has the meaning set forth in Section 2.01(b).

"**Post-Closing Access Period**" has the meaning set forth in Section 8.02.

"**Power Fund**" has the meaning set forth in Section 3.02(e).

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing.

"**Project Records**" has the meaning set forth in Section 2.01(e).

"**Projects**" means the distributed generation systems owned or leased and operated by Sellers and that are described on Schedule 4.05.

"**Project Site**" means the location of each Project as more specifically set forth on Schedule 4.05.

"**Prorations and Adjustments**" has the meaning set forth in Section 2.06(a).

"**PUHCA**" means the Public Utility Holding Company Act of 1935, as amended from time to time.

"**Purchase Price**" has the meaning set forth in Section 2.05(d).

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Purchased Liabilities**" has the meaning set forth in Section 2.03.

"**Qualifying Facility**" shall mean an electric generating plant that is a "qualifying small power production facility" or a "qualifying cogeneration facility" as such terms are defined in the Public Utility Regulatory Policy Act or any similar definitions under applicable state law.

"**RealEnergy**" has the meaning set forth in the preamble.

"**Rebates**" has the meaning set forth in Section 2.02(d).

"**Release**" means release, spill, emission, leaking, emitting, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration.

"**Remaining Projects**" means all of the Projects other than the Beale Project, the Market Street Project and the Fremont Project.

"**RE Projects I**" has the meaning set forth in the preamble.

"**RE Projects II**" has the meaning set forth in the preamble.

"**Repair**" has the meaning set forth in Section 2.06(b).

"**Retained Accounts**" has the meaning set forth in Section 2.02(b).

"**Seller**" has the meaning set forth in the preamble.

"**Sellers' Representative**" means RealEnergy, Inc., a Delaware corporation.

"**Sellers**" has the meaning set forth in the preamble.

"**Tax or Taxes**" means (a) all taxes, fees, levies, duties, assessments or other governmental charges (whether federal, state, local or foreign) based upon or measured by income and any other tax whatsoever, including gross receipts, profits, sales, use, occupation, value added, ad valorem, estimated, transfer, franchise, withholding, payroll, employment, unemployment, severance, stamp, occupancy, excise, or property taxes, together with any interest or penalties imposed with respect thereto and (b) any obligations under Treasury Regulation section 1.1502 6 or comparable state law provisions or under any agreements or arrangements with respect to any Taxes described in clause (a) above.

"**Tax Returns**" means any return, report, information return, declaration, claim for refund, or other document, together with all amendments and supplements thereto (including all related or supporting information), required to be supplied to any Governmental Body responsible for the administration of laws governing Taxes.

"**Transaction Taxes**" has the meaning set forth in Section 2.07(b).

"**Viceroy Account**" has the meaning set forth in Section 2.01(h).

ARTICLE 2

PURCHASE AND SALE OF ASSETS

2.01    Transfer of Assets.  On the terms and subject to the conditions set forth in this Agreement, and subject to the exceptions provided in Section 2.02, on the Closing Date, Sellers shall sell, convey, assign, transfer and deliver to Buyer, free and clear of any and all Encumbrances (except Permitted Encumbrances), and Buyer shall acquire, all of Sellers' right, title and interest in and to, the following properties and assets (collectively, the **"Purchased Assets"**):

(a)    Fixed Assets and Other Personal Property.  All generators, turbines, HVAC systems, metering equipment, machinery, equipment and other fixed assets and tangible personal property used or held for use primarily in relation to the Projects or that are located at the premises of the Projects or otherwise set forth on Schedule 2.01(a);

(b)    Leased Property.  All real property leased by Sellers and personal property leased by or licensed to Sellers (**"Personal Property Leases"**), in each case, in connection with the Projects and that are set forth on Schedule 2.01(b) (collectively, **"Assigned Leases"**);

(c)    <u>Permits</u>. To the extent transferable, all licenses, permits, orders, franchises, certificates and approvals of or issued by any Governmental Body that are owned or held by, or that otherwise have been granted to or for the benefit of, any Sellers and that relate to the operation of the Projects, including, without limitation, those set forth on <u>Schedule 2.01(c)</u> (collectively, **"Permits"**);

(d)    <u>Contract Rights</u>. All right, title and interest of Sellers in, to and under all of the contracts, leases, agreements, commitments, guaranties, warranties and all other legally binding arrangements, to which any Seller is party or by which any Seller is bound relating to the Projects and that are set forth on <u>Schedule 2.01(d)</u> (collectively, **"Contract Rights"**);

(e)    <u>Books and Records</u>. The business records of Sellers primarily related to the Projects or to the Purchased Assets (the **"Project Records"**), whether in hard, copy, electronic or other form, including, without limitation, all training materials, sales and promotional literature, manuals of data, sales and purchase correspondence, contractor change orders, historical sales records and data, customer lists, supplier lists, catalogues; <u>provided, however</u>, that, Sellers may, at their sole cost and expense, make and retain copies of any Project Records;

(f)    <u>Intellectual Property</u>. To the extent transferable, any third party proprietary software and other intellectual property and proprietary rights embodied in or reflected in the Purchased Assets described in subsection (a) of this <u>Section 2.01</u>;

(g)    <u>Keys; Access Codes</u>. All sets of keys to the Projects, any access or security codes and any reports, manuals and warranties relating to any security devices or alarm systems relating to the Projects;

(h)    <u>Viceroy Account</u>. The account receivable owed by Roscoe Real Estate, LP, or its successors, in connection with Pacific Shores (Viceroy) 1819 Ocean Avenue, Santa Monica (the **"Viceroy Account"**);

(i)    <u>Inventory</u>. All inventory set forth on <u>Schedule 2.01(i)</u> (collectively, the **"Inventory"**);

(j)    <u>Arden Prepaid Access Fees</u>. The prepaid access fees relating to the following Projects: 100 Oceangate, Long Beach, California; 9333 & 9339 Genesee Avenue, San Diego, California; 701 B Street, San Diego, California; and 9325 & 9275 Sky Park, San Diego, California (collectively, the **"Arden Prepaid Access Fees"**); and

(k)    <u>Other Claims</u>. All rights, claims and causes of action that Sellers may have relating to the Projects, the Purchased Assets or the Purchased Liabilities, including without limitation, all rights of Sellers under or pursuant to all warranties, representations, guarantees and service agreements, if any, made by suppliers, manufacturers and contractors in connection with products sold or services provided to Sellers for the Projects, the Purchased Assets or the Purchased Liabilities, in each case, to the extent, and only to the extent, that such rights, claims and causes of action arise out of events occurring after the Closing Date.

1099836 9                                    - 7 -

Notwithstanding the foregoing, if at the Closing, the Market Street Holdback is withheld from the Purchase Price, then title to the Market Street Project and all Purchased Assets related thereto shall not be transferred by Sellers to Buyer unless and until the entire amount of the Market Street Holdback has been remitted by Buyer to Sellers, subject to reduction in accordance with Section 2.05(d).

2.02    Excluded Assets. Notwithstanding anything to the contrary contained in Section 2.01, Sellers shall not sell, assign, transfer, convey or deliver to Buyer, and Buyer shall neither purchase nor acquire from Sellers, any of the following (collectively, the **"Excluded Assets"**):

(a)    Cash and Cash Equivalents. Any cash, certificates of deposit, or other cash equivalents items;

(b)    Accounts Receivable and Other Assets. Subject to Section 2.06(c), (i) all accounts receivable, notes receivable, credits, prepaid expenses, deferred charges, advance payments, security and other deposits and prepaid items in existence as of the Closing Date other than the Viceroy Account and the Arden Prepaid Access Fees (collectively, the **"Retained Accounts"**), and (ii) all rights to causes of action, lawsuits, judgments, claims and demands relating to the Retained Accounts;

(c)    Books and Records. All of the stock record books and minute books of Sellers and similar corporate records required by law to be retained by Sellers and any other books and records of Sellers other than the Project Records;

(d)    Tax Refunds and Credits; Rebates. (i) All claims for Tax refunds and Tax credits attributable to a Pre-Closing Tax Period, and (ii) all claims for rebates, including, without limitation, rebates under governmentally sponsored programs relating to "clean" or renewable energy of any kind (collectively, the items in clauses (i) and (ii), **"Rebates"**);

(e)    Insurance Claims and Proceeds. All insurance claims and proceeds under insurance policies of Sellers;

(f)    Employee Benefit Plans. All rights of Sellers under, and all funds and property held in trust pursuant to, any Employee Benefit Plans applicable to any employees of Sellers;

(g)    Intellectual Property. Any and all patents, trademarks (registered or unregistered), trade names, copyrights, proprietary software and service marks and other intellectual property and proprietary rights, whether or not subject to statutory registration or protection, owned, used, filed by or licensed to any Seller other than intellectual property described in Section 2.01(f);

(h)    Contracts. (i) All real property and personal property leased by Sellers other than the Assigned Leases and (ii) all contracts, agreements, commitments and other legally binding arrangements of Sellers or binding the assets of Sellers other than the Contracts Rights;

- 8 -

(i)    Remote Monitoring Equipment. Phone lines, DSL lines, computer hardware, servers, software and related telecommunications access and equipment and Sellers' protocol converter boxes located at the Projects (provided, however, that Buyer will be permitted to utilize these assets to the extent provided in Section 8.04(b)); and

(j)    Other Claims. All rights, claims and causes of action relating to the Projects or the Purchased Assets to the extent that such rights, claims and causes of action relate to periods, or arise out of events occurring, prior to the Closing.

2.03    Obligations and Liabilities Assumed. Buyer, at and after the Closing, and subject to Section 2.04, shall assume the following obligations and liabilities of Sellers and no others (collectively, the **"Purchased Liabilities"**):

(a)    Assigned Leases, Permits and Contract Rights. All liabilities and obligations arising under or related to the Assigned Leases, Permits and Contract Rights assigned to Buyer pursuant to Sections 2.01(b), 2.01(c) and 2.01(d), respectively, to the extent arising after the Closing;

(b)    Acquired Debt. The Acquired Debt;

(c)    Taxes. All real property Taxes and personal property Taxes related to the Purchased Assets attributable to any taxable period ending after the Closing; and

(d)    Other Liabilities. All other liabilities and obligations relating the Purchased Assets to the extent arising after the Closing.

2.04    Obligations and Liabilities Not Assumed. Notwithstanding anything to the contrary contained in Section 2.03, Buyer shall not assume or be liable with respect to, and Sellers shall remain liable for, any of the following liabilities or obligations (collectively, the **"Excluded Liabilities"**):

(a)    Litigation. All liabilities or obligations of Sellers for any litigation, claim, dispute or action, including, without limitation, those listed on Schedule 2.04(a);

(b)    Contract Rights and Permits. All liabilities or obligations arising under or related to any Contract Right (other than the Acquired Debt) or Permit arising before the Closing;

(c)    Taxes. All liabilities or obligations for Taxes of Sellers arising before and after the Closing or liabilities or obligations for real property Taxes or personal property Taxes related to the Purchased Assets with respect to a Pre-Closing Tax Period (but, for the avoidance of doubt, excluding any Transaction Taxes, for which Buyer acknowledges that it shall be liable, as provided in Section 2.07(b));

(d)    Environmental. All liabilities or obligations for any violation or breach of any Environmental Law arising before the Closing;

(e)    Employees; ERISA. All liabilities or obligations associated with present or former employees, agents, representatives, consultants or other personnel,

including, without limitation, any liability or obligation under any Employee Benefit Plan or ERISA; and

        (f)      <u>Excluded Assets</u>. All liabilities or obligations associated with the Excluded Assets or relating the Purchased Assets to the extent arising before the Closing.

    2.05    <u>Purchase Price; Closing Payment</u>.

        (a)      In consideration of the Purchased Assets, Buyer will, subject to the terms and conditions hereof, at the Closing, pay the Purchase Price and assume the Purchased Liabilities.

        (b)      In the event that, as of the Closing, Sellers have not been able to obtain evidence of the satisfaction of the liabilities and obligations secured by mechanics' liens and releases and discharges of such mechanics' liens, as contemplated by <u>Section 3.02(f)</u>, then Buyer shall withhold from the Purchase Price an amount equal to the dollar amount of the liabilities or obligations secured by such mechanics' liens (the **"Lien Holdback"**), unless and to the extent that Sellers provide to Buyer, at Sellers' cost and expense, the benefit of a bond or other substantially equivalent economic protection with respect to such mechanics' liens. Promptly following the release and discharge of such mechanics' liens, Buyer shall remit the Lien Holdback (or applicable portion thereof) to Sellers and/or shall re-assign to Sellers entitlements under any bond or other security device previously provided to Buyer.

        (c)      In the event that, as of the Closing, Sellers have not been able to obtain evidence of the releases and discharges of each litigation or dispute set forth on <u>Schedule 4.07</u>, then Buyer shall withhold from the Purchase Price an amount equal to the dollar amount of the liabilities or obligations involved in such un-resolved litigation or dispute as set forth on <u>Schedule 4.07</u> (the **"Litigation Holdback"**). Promptly following the release and discharge of such litigation or dispute, Buyer shall remit the Litigation Holdback (or applicable portion thereof) to Sellers.

        (d)      The purchase price for the Purchased Assets (as adjusted pursuant to <u>Sections 2.06</u> and <u>6.11(b)</u>) shall be $21,313,426 (the **"Purchase Price"**). Notwithstanding the foregoing, in the event that satisfactory completion of pre-parallel testing on the Market Street Project has not occurred by the Closing, $1,000,000 (the **"Market Street Holdback"**) will be withheld from the Purchase Price and retained by Buyer until satisfactory completion of pre-parallel testing at such Project. Buyer and its representatives shall be given reasonable advance written notice of the proposed date of, and shall be present at, such pre-parallel testing of such Project. Seller shall provide copies of or otherwise notify Buyer of all material communications from or to the contractor on the Market Street Project and shall promptly notify Buyer of any material developments at such Project. Upon completion of pre-parallel testing in accordance with this <u>Section 2.05(d)</u>, Buyer shall remit the Market Street Holdback amount to Sellers upon Sellers' satisfaction of the conditions set forth in <u>Section 3.02(a)</u> through and including subsection (f) thereof, and <u>Section 3.04</u>; <u>provided, that</u> payment of the Market Street Holdback shall be subject to set-off and reduction for the amount of any punch-list items remaining unsatisfied at the time of transfer of title to the Market Street Project.

(e)     At the Closing, Buyer shall, subject to the adjustments provided for in Sections 2.06 and 6.11(b), pay to Sellers an amount in cash equal to (i) $21,313,426, minus (ii) the Acquired Debt, and, as applicable, any or all of the following: the Market Street Holdback, the Lien Holdback, and the Litigation Holdback. The cash payment by Buyer to Sellers pursuant to this Section 2.05(e) shall be made by wire transfer of immediately available funds to an account to be designated by Sellers by written notice to Buyer at least two (2) Business Days prior to the Closing Date.

2.06     Prorations. Any item of income or expense properly allocable to periods before and after the Closing, and any deposits, shall be allocated, prorated or charged consistent with the following provisions:

(a)     Expenses. All expenses, including, without limitation, (i) power and utilities charges, fuel (including, without limitation, natural gas), rent payments and real property Taxes, and (ii) prepaid rent, prepaid access fees, prepaid taxes and other prepaid and deferred items listed on Schedule 2.06(a) (but, for the avoidance of doubt, excluding the Arden Prepaid Access Fees), that relate to periods before and after the Effective Time shall be prorated and charged based on actual usage in such time period, to the extent reasonably determinable, or if not reasonably determinable, based on the number of days in such time period (collectively, the "**Prorations and Adjustments**"). To the extent that any of the Prorations and Adjustments can be determined as of the Closing Date, such amounts will increase or decrease, as applicable, the cash payment to be made at the Closing pursuant to Section 2.05(e). To the extent that any of the Prorations and Adjustments cannot be determined as of the Closing Date, Buyer and Sellers agree make a further payment to each other necessary to implement the Prorations and Adjustments in accordance with Section 2.06(d).

(b)     Repairs. Sellers shall use commercially reasonable efforts to complete each repair, maintenance, installation, replacement, and overhaul item (each, a "**Repair**") listed on Schedule 4.04(c) prior to the Closing Date. In the event that any such Repair has not been completed, or has not been completed in accordance with prudent industry practices, prior to the Closing Date, the amount attributable to such item, which amount shall be reasonably agreed upon by Sellers and Buyer, shall decrease the cash payment to be made by Buyer at the Closing pursuant to Section 2.05(e); provided, however, that, except as provided in the next sentence, the aggregate decrease to such cash payment in respect of Repairs that are not completed prior to the Closing Date shall not exceed $50,000. Notwithstanding the foregoing, in the event that the chiller at the Project known as 701B Street, San Diego, California, has not been repaired or replaced prior to the Closing Date, then, unless Buyer and Sellers otherwise agree, (i) the cash payment to be made by Buyer at the Closing pursuant to Section 2.05(e) shall be decreased by an amount equal to $43,000 (which amount includes the cost of the chiller referred to in subclause (ii)) and (ii) such un-repaired chiller shall be replaced with a chiller that is currently part of the Inventory.

(c)     Accounts Receivable and Other Revenue. Buyer, on behalf of Sellers, shall use commercially reasonable efforts to collect payment of the Retained Accounts and shall remit payment to Sellers promptly upon receipt in the same manner collected by or delivered to Buyer. Sellers shall not institute an action, suit or proceeding to collect any

Retained Account without the written consent of Buyer. In the event that Buyer shall withhold consent, which consent may be withheld in its sole discretion, Buyer shall purchase such Retained Account (less the reasonable anticipated costs of collection for such Retained Account) whereupon Sellers shall, simultaneous with such purchase, execute and deliver such instruments or assignments to evidence such sale and transfer as Buyer reasonably requests. Buyer shall not be liable to Sellers for any action taken or omitted to be taken by it under this Section 2.06(c) except for the failure to make available promptly (after receipt and final collection) to Sellers such sums as are required to be remitted to Sellers pursuant to this Section 2.06. To the extent that after the Closing, (i) Buyer collects any amounts in respect of accounts receivable or other revenue (including any Rebates) other than any amounts in respect of the Viceroy Account, that relate to periods prior to the Effective Time, Buyer shall, as soon as practicable, but in no event later than ten (10) days after receipt thereof, remit such amounts to Sellers and (ii) Sellers collect any amounts in respect of the Viceroy Account or in respect of accounts receivable or other revenue that relate to any period after the Effective Time, Sellers shall, as soon as practicable, but in no event later than ten (10) days after receipt thereof, remit such amounts to Buyer. If any amount is received by either Buyer or Sellers that does not reference a specific invoice, such amount shall be applied on a first-in, first-out basis, such that the amount will be applied to reduce amounts owing under the oldest outstanding invoice relating to the customer from which such amount has been received.

      (d)    Prorations and Adjustments. Not more than forty-five (45) days following the Closing Date, Buyer shall provide the Sellers' Representative with a draft of the Prorations and Adjustments that could not or were not determined before the Closing Date as contemplated by Section 2.06(a). The Sellers' Representative shall give written notice to Buyer of any objection to the Prorations and Adjustments within ten (10) days after receipt by the Sellers' Representative of the draft Prorations and Adjustments. In the event that the Sellers' Representative fails to timely object to the draft Prorations and Adjustments, such draft shall be deemed final, and payment to the applicable parties shall be made in accordance with the last sentence of this Section 2.06(d). In the event the Sellers' Representative timely objects to the draft Prorations and Adjustments, such notice of objection shall specify in reasonable detail to which items of the Prorations and Adjustments the Sellers' Representative objects and shall provide a summary of its reasons for such objections. If the Sellers' Representative has delivered its notice of objections in accordance with this Section 2.06(d), it shall not be entitled to raise any additional objections that would result in a decrease in the Purchase Price, except with respect to items described in the last sentence of this Section 2.06(d). Buyer and the Sellers' Representative will in good faith attempt to resolve any disputes with respect to such Prorations and Adjustments for a period of ten (10) days after receipt by Buyer of the objection notice from the Sellers' Representative and shall thereafter submit any unresolved disputes to binding arbitration in accordance with Section 9.10. Sellers shall pay to Buyer, or Buyer shall pay to Sellers, as the case may be, the amount of over-paid or under-paid Purchase Price, as the case may be, based on the Prorations and Adjustments (i) within 5 days after the final determination of the Prorations and Adjustments if determined pursuant to this Section 2.06(d) or (ii) in accordance with Section 9.10 if the final Prorations and Adjustments are determined by arbitration. Notwithstanding the foregoing, to the extent that an item of Prorations and Adjustments is not determinable within the 45-day period provided above, the parties shall

use commercially reasonable efforts to promptly determine the amount of such item and shall, promptly after such determination, make any payments required by the preceding sentence.

2.07    Allocation and Sales Tax.

(a)    As soon as practicable after the Closing, but in no event later than ninety (90) days after the Closing Date, Buyer shall deliver to the Sellers' Representative an allocation of the Purchase Price, as adjusted pursuant to Sections 2.05 and 2.06 (the **"Allocation"**). Sellers and Buyer shall use the Allocation for all reporting purposes having to do with Taxes. Sellers and Buyer will timely file any forms required to be filed under Section 1060 of the Code and any corresponding provision of Tax law. In addition, Sellers and Buyer each agree (i) to file all Tax Returns and determine all Taxes (including, without limitation, for purposes of Section 1060 of the Code) in accordance with and based upon the Allocation and (ii) not to take any position inconsistent with such Allocation in any audit or judicial or administrative proceeding or otherwise.

(b)    Sellers and Buyer shall cooperate in preparing and filing sales and use Tax Returns relating to the sale and purchase of the Purchased Assets. Buyer shall pay all sales and use Tax, or other transfer Tax, arising out of, or in connection with, the transactions contemplated by this Agreement (collectively, the **"Transaction Taxes"**).

2.08    Appointment of Seller's Representative. Sellers hereby appoint the Sellers' Representative as the attorney-in fact of each of the Sellers, with full power and authority, including, without limitation, power of substitution, acting in the name of and for and on behalf of each Seller to amend or waive any provision of this Agreement, to terminate this Agreement and to do all other things and to take all other action under or related to this agreement that the Sellers' Representative, in its sole and absolute discretion, may consider necessary or proper to carry out the terms hereof and to resolve any dispute with Buyer over any aspect of this agreement and on behalf of each Seller to enter into any agreement, instrument or other document to effectuate any of the foregoing, which shall have the effect of binding each Seller as if such Seller had personally entered into such agreement, instrument or document. This appointment and power of attorney shall be deemed as coupled with an interest and all authority conferred hereby shall be irrevocable and shall not be subject to termination by operation of law, whether by the dissolution, merger, reorganization or bankruptcy of any Seller or the occurrence of any other event or events and the Sellers' Representative may not terminate this power of attorney with respect to any Seller or such Seller's successor or assigns without the prior written consent of Buyer.

ARTICLE 3

CLOSING

3.01    Time and Place of Closing. Subject to the provisions of Article 7, the Closing shall take place at the offices of Irell & Manella LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, California, 90067, or at such other place as the parties shall agree in writing, within three (3) days after all of the conditions to Closing set forth in this Article 3

1099836 9                                    - 13 -

have been satisfied. For all purposes of this Agreement, the effective time (the "**Effective Time**") of the Closing shall be 12:01 a.m. on such date.

 3.02 <u>Deliveries by Sellers</u>. At the Closing, Sellers shall deliver to Buyer:

  (a) a bill of sale and instrument of assignment executed by Sellers in substantially the form of <u>Exhibit A</u>;

  (b) a certificate of the Secretary or an Assistant Secretary of each Seller certifying: (i) a true copy of the Certificate of Incorporation or Certificate of Formation (as applicable) of such Seller and all amendments thereto as in effect at Closing, (ii) a true copy of the Bylaws or Operating Agreement, as applicable, of such Seller as in effect at Closing, (iii) copies of resolutions duly adopted by such Seller's board of directors (or similar body), authorizing the sale of the Purchased Assets to Buyer and the execution, delivery and performance of this Agreement and the transactions contemplated hereby and attesting that such resolutions are in full force and effect without amendment or modification at Closing, and (iv) the incumbency of the officers of such Seller who execute this Agreement or any document or instrument to be delivered pursuant hereto;

  (c) a certificate signed by an authorized officer of each Seller to the effect that the conditions specified in <u>Sections 3.05(a)</u> and <u>(b)</u> have been satisfied; and

  (d) a release letter signed by Far East National Bank which shall be in form and substance reasonably satisfactory to Buyer and shall release any Encumbrance on the Projects and the Purchased Assets in favor of such lender, together with UCC-3 termination statements or such other signed release or termination statements that shall be in a form that will be accepted for filing by the appropriate Governmental Body;

  (e) UCC-3 termination statements or such other signed release or termination statements that shall be in a form that will be accepted for filing by the appropriate Governmental Body, evidencing the termination of the Encumbrances, if any, on the Purchased Assets granted pursuant to the Security Agreement by and among RealEnergy, OCM/GFI Power Opportunities Fund, L.P. (the "**Power Fund**"), Global Innovation Partners, LLC ("**GIP**") and Gryffindor Capital Partners I, L.L.C.;

  (f) (i) evidence that all liabilities or obligations secured by any mechanics' liens have been paid in full and copies of signed releases and discharges of any such mechanics' liens, which shall be in a form that will be accepted for filing by the appropriate Governmental Body, all of which shall be in form and substance reasonably satisfactory to Buyer or (ii) compliance with the provisions of <u>Section 2.05(b)</u>;

  (g) (i) evidence that all disputes or litigation against Sellers set forth on <u>Schedule 4.07</u> have been settled, fully paid, released and discharged by each disputing or claiming party, and copies of such settlement agreements and releases, which shall be in a form and substance reasonably satisfactory to Buyer or (ii) compliance with the provisions of <u>Section 2.05(c)</u>;

(h)     a letter from the Power Fund and GIP, addressed to Buyer, in the form of Exhibit B;

(i)     an opinion of Irell & Manella LLP, outside counsel to Sellers, in substantially the form of Exhibit C; and

(j)     an opinion of Scott S. Thompson, general counsel to Sellers, in substantially the form of Exhibit D.

3.03    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Sellers:

(a)     the Purchase Price in the amount and in the manner set forth in Section 2.05;

(b)     an instrument of assumption executed by Buyer substantially the form of Exhibit E;

(c)     a certificate of the Secretary or an Assistant Secretary of Buyer certifying: (i) a true copy of its Certificate of Formation and all amendments thereto as in effect at Closing, (ii) a true copy of its Operating Agreement as in effect at Closing, (iii) copies of the resolutions of its board of directors (or similar body) authorizing the purchase of the Purchased Assets from Sellers and the execution, delivery and performance of this Agreement and the transactions contemplated hereby and attesting that such resolutions were adopted and are in full force and effect without amendment or modification at Closing, and (iv) the incumbency of the officers of Buyer who execute this Agreement or any document or instrument to be delivered pursuant hereto;

(d)     a certificate signed by an authorized officer of Buyer to the effect that the conditions specified in Sections 3.04(a) and (b) have been satisfied; and

(e)     an opinion of Paul, Hastings, Janofsky & Walker LLP, counsel to Buyer, in substantially the form of Exhibit F.

3.04    Conditions to Buyer's Obligations to Close.  The obligations of Buyer to effect the transactions contemplated in this Agreement are subject to the satisfaction on or prior to the Closing Date, or waiver by Buyer, of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Sellers made in this Agreement shall be true and correct in all material respects, as of the date hereof and as of the Closing Date.

(b)     Performance.  Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied by them on or prior to the Closing Date (including, without limitation, the deliveries required by Section 3.02).

(c)     Authorizations.  The parties shall have or shall have caused to be delivered, made or obtained all notices to, declarations, designations, registrations, filings or submissions with, and authorizations, approvals, orders, consents or waivers from

Governmental Bodies and other Persons listed on Schedule 3.04(c), and the same shall not have been withdrawn, suspended or modified.

(d)    Absence of Orders.  No preliminary or permanent injunction or other order of any Governmental Body to prevent the consummation of the transactions contemplated in this Agreement shall be in effect or pending and no statute, rule or regulation shall have been enacted by any Governmental Body that makes consummation of such transactions illegal.

(e)    Material Adverse Effect.  No Material Adverse Effect shall have occurred and be continuing.

(f)    Qualifying Facility Status.  Sellers shall have filed a Form 556 (or a similar or substitute form having the effect of a Form 556) with the FERC for each of the Projects set forth on Schedule 3.04(f), and the Sellers shall have delivered to Buyer a copy of such filed Form 556 (or similar or substitute form), file-stamped by the FERC.

(g)    Air Permits.  Sellers shall have provided Buyer with evidence that all fees have been paid to the appropriate Governmental Body for the Air Permits listed on Schedule 2.01(c).

3.05    Conditions to Sellers' Obligations to Close.  The obligations of Sellers to effect the transactions contemplated in this Agreement is subject to the satisfaction on or prior to the Closing Date, or waiver by Sellers, of each of the following conditions:

(a)    Accuracy of Representations and Warranties.  The representations and warranties of Buyer made in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date.

(b)    Performance.  Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date (including, without limitation, the deliveries required by Section 3.03).

(c)    Authorizations.  The parties shall have or shall have caused to be delivered, made or obtained all notices to, declarations, designations, registrations, filings or submissions with, and authorizations, approvals, orders, consents or waivers from Governmental Bodies and other Persons listed on Schedule 3.04(c) (including the consent of the holders of the Acquired Debt), and the same shall not have been withdrawn, suspended or modified.

(d)    Absence of Orders.  No preliminary or permanent injunction or other order of any Governmental Body to prevent the consummation of the transactions contemplated in this Agreement shall be in effect or pending and no statute, rule or regulation shall have been enacted by any Governmental Body that makes consummation of such transactions illegal.

1099836 9

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant to Buyer that the statements contained in this Article 4 are true and complete as of the date of this Agreement and will be true and complete as of the Closing Date, except as set forth in the Disclosure Schedule (provided, however, that each disclosure set forth in the Disclosure Schedule shall not be deemed to refer to any section other than (i) the specific section or sections referenced in such disclosure and (ii) any other sections where the applicability of the disclosed matter or circumstance to the representation or warranty in question is reasonably obvious):

4.01    Corporate Existence and Authority.  RealEnergy is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of RE Projects I and RE Projects II are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Delaware. All actions and other proceedings required to be taken by each Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.  Assuming the due execution hereof by Buyer, this Agreement will constitute a legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by general equitable principles and by bankruptcy, insolvency, reorganization, debtor relief or similar laws affecting the rights of creditors generally.

4.02    No Conflicts; Consents.  The execution and delivery of this Agreement and the other transaction documents contemplated hereby do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, (a) conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, (i) any provision of the Certificate of Incorporation, Certificate of Formation, Bylaws or Operating Agreement, as applicable, of any Seller, or (ii) any judgment, order, decree, Permit, statute, law, ordinance, rule or regulation applicable to any Seller or the Purchased Assets; (b) except as set forth in Schedule 4.02, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or loss of a material benefit under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, agreement or arrangement to which any Seller is a party or by which any Seller or any of the Purchased Assets is bound, or (c) result in the creation of any Encumbrance upon any of the Purchased Assets, in the case of clauses (a)(ii), (b) and (c), except as would not prevent Sellers from consummating the transactions contemplated by this Agreement and would not constitute a Material Adverse Effect.  Except as set forth on Schedule 4.02, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Body or any Person is required to be obtained or made by or with respect to any Seller, the Purchased Assets or the Purchased Liabilities in connection with the execution, delivery and performance of this Agreement, the other transaction documents contemplated hereby or the consummation of the transactions contemplated hereby other than those that may be required solely as result of the specific regulatory status of Buyer.

1099836 9                                                              - 17 -

4.03    Organization and Standing.  Each Seller has full power and authority to own, lease or otherwise hold its properties and assets, to carry on its business as presently conducted, and to execute and deliver this Agreement and the other transaction documents contemplated hereby to which such Seller is a party and perform its respective obligations hereunder and thereunder.  Each Seller is duly qualified and in good standing to do business as a foreign corporation or limited liability company, as applicable, in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary.

4.04    Purchased Assets.

(a)    The Purchased Assets, together with (i) the remote monitoring services described in Section 8.04(b) and the license rights described in Section 8.04(c) and (ii) general overhead assets, management information systems and other similar assets, which Buyer is not purchasing pursuant from Seller to this Agreement, constitute all of the material assets used in the operation of each of the Projects and all of the material assets necessary to permit Buyer to operate the Projects consistent with prior practices and as heretofore conducted by Sellers.

(b)    Each Seller has good and valid title to the Purchased Assets (other than leased real property and leased personal property, which are addressed in Section 4.05), in each case free and clear of all Encumbrances of any kind except such Encumbrances as are set forth in Schedule 4.04(b) and liens for Taxes and other charges of Governmental Bodies that are not due or payable or that may hereafter be paid without penalty (collectively, **"Permitted Encumbrances"**).

(c)    Except as set forth on Schedule 4.04(c), all of the tangible assets and properties constituting the Purchased Assets other than Inventory (including the leased personal property subject to the Personal Property Leases) are in good operating condition and repair in accordance with industry practice and as required by seller and vendor warranties (subject only to ordinary wear and tear arising out of the use for which such properties and assets were designed) and sufficient for the conduct of the normal operation of the Projects as presently conducted.  There is no Repair that materially impacts the operability of any Project or of the Purchased Assets (other than Inventory) that is omitted from Schedule 4.04(c) except for Repairs that either the construction contractor for the relevant Project or Hess Microgen LLC is legally required to perform in accordance with the terms of the applicable Contract Rights.

4.05    Assigned Leases.

(a)    Each Seller has good and valid title to the leasehold estates in all Assigned Leases, in each case free and clear of all Encumbrances, except Permitted Encumbrances and assignments, subleases, easements, covenants, rights-of-way and other similar restrictions, none of which materially impair the right of access, use or operation of the property leased under the Assigned Leases, as the case may be.

(b)    The Assigned Leases are in full force and effect and are a legal and binding obligation enforceable by or against the applicable Seller and, to the knowledge of

Sellers, the other parties thereto. Neither Seller, nor to Seller's knowledge, any other party thereto, is in breach or default under the Assigned Leases, and no event has occurred that, with the giving of notice or passage of time, would constitute a default thereunder. No Seller has received a notice from a landlord or licensor under any Assigned Lease stating that such Seller is in default of such Assigned Lease.

(c)     To Sellers' knowledge, each Project Site and any improvements constructed thereon and their current use, conform in all material respects to (i) all Applicable Laws, and (ii) all restrictive covenants, if any, or other Encumbrances affecting all or a part of such premises. There are no pending, or to Sellers' knowledge, threatened, condemnation actions or special assessments or proceedings for changes in the zoning with respect to the Project Sites. Seller has complied in all material respects with all notices and orders to correct violations of Applicable Law issued by any Governmental Body to any Sellers in relation to the Project Sites.

(d)     Each Project is located at each respective Project Site, each of which is disclosed on Schedule 4.05.

4.06    Brokers. Except as disclosed on Schedule 4.06, Sellers have not expressly or impliedly engaged any broker, finder or agent with respect to any transaction contemplated by this Agreement. All amounts owed to any such broker, finder or agent listed on Schedule 4.06 shall be paid by Sellers, and Buyer shall have no responsibility therefor.

4.07    Litigation. Except as set forth on Schedule 4.07, there is no action, suit, proceeding, claim, charge, grievance or investigation pending or, to the knowledge of Sellers, threatened against any Seller before any court, arbitrator or Governmental Body (a) relating to or affecting the Projects, (b) involving any property or asset included in the Purchased Assets or the Purchased Liabilities or (c) that seeks to prevent or challenge the transactions contemplated hereby.

4.08    Contract Rights. Each of the Contract Rights is in full force and effect, is a legal and binding obligation enforceable by or against the applicable Seller and, to the knowledge of Sellers, the other parties thereto. Each Seller has performed all material obligations required pursuant to each of the Contract Rights to have been performed by it. Except as set forth on Schedule 4.08, no event has occurred that constitutes or, with the giving of notice or passage of time, or both, would constitute, a material default by any Seller under any such Contract Right or, to the knowledge of Sellers, any third party under any such Contract Right. To Sellers' knowledge, no claim, action, proceeding or investigation, is pending or threatened, that challenges the enforceability of any of the Contract Rights.

4.09    Tax Matters. Except as set forth in Schedule 4.09:

(a)     none of the Sellers holds a "Seller's Permit to Engage in Sales of Tangible Personal Property" issued by the State of California, and none of the Sellers has within the past twelve (12) months made, and has any current intention of making in the next twelve (12) months, any retail sales of tangible personal property within the State of California;

(b)     each of the Tax Returns required to be filed by or on behalf of or with respect to a Seller or the Purchased Assets has been or will be timely filed with the appropriate taxing authorities in all jurisdictions in which such Tax Returns are required to be filed;

(c)     such Tax Returns are or will be true and correct in all material respects when filed, and were or will be prepared in material compliance with all applicable laws and regulations; all Taxes due and payable by Sellers or with respect to such Tax Returns have been or will be timely paid, and Sellers are not and will not be liable to any Governmental Authority or to a third party (including any affiliate of Sellers) by contract or otherwise for any additional Taxes in respect of any taxable period or any portion thereof ending on or before Closing;

(d)     none of the Sellers has extended or waived the application of any statute of limitations of any jurisdiction regarding the assessment or collection of any Tax;

(e)     there are no audits, actions, suits, investigations, claims, assessments, levies, administrative proceedings, or lawsuits pending, or, to the knowledge of Sellers, threatened against any of Sellers or with respect to the Purchased Assets or Purchased Liabilities by any taxing authority;

(f)     there are no Encumbrances for Taxes (other than Permitted Encumbrances) upon the assets of any Sellers or the Purchased Assets;

(g)     no written claim has been made by any Tax authority in a jurisdiction where any of the Sellers do not currently file Tax Returns that they are or may be subject to Tax by such jurisdiction, nor to Sellers' knowledge has any Tax authority threatened to make such an assertion;

(h)     none of the Sellers has any outstanding requests for any extension of time within which to pay its Taxes or file its Tax Returns;

(i)     none of the Sellers is presently liable, and Sellers do not have any potential liability, for the Taxes of another Person (i) as transferee or successor, or (ii) by contract or indemnity or otherwise;

(j)     no Seller is a "foreign person" within the meaning of Section 1445(f)(3) of the Code;

(k)     Sellers have timely withheld and timely paid all Taxes required to be withheld by them in connection with any amounts paid or owing to any employee, creditor, independent contractor or other third party; and

(l)     None of the Purchased Assets is subject to a tax benefit transfer lease subject to the provisions of former Section 168(f)(8) of the Code or is tax-exempt use property or tax-exempt bond financed property, as such terms are used in Section 168(g) of the Code.

1099836 9

4.10    Permits.  Schedule 4.10 sets forth a complete and correct list of all current material Permits in effect maintained by Sellers relating to the Projects or that are necessary for the use, ownership and operation of the Projects.  Sellers have all material Permits necessary for the operation of the Projects, as presently conducted, and are in material compliance with the terms of such Permits.  All such Permits are validly issued in full force and effect and no amendments to any such Permits are pending or imminent before any Governmental Body, and to the knowledge of Sellers, there are no proceedings before any Governmental Body that could in any material respect affect any such Permit.

4.11    Compliance with Laws.  Each Seller complies in all material respect with all Applicable Laws that apply to such Seller's operation of the Projects and ownership or use of the Purchased Assets, and no Seller has received any written notice from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with any Applicable Law.

4.12    Environmental Matters.  Except as set forth on Schedule 4.12, Sellers have received no notice from any Governmental Body of any violation or other potential liability under any applicable Environmental Laws or of any Environmental Claim.  Except as set forth on Schedule 4.12, (a) no condition exists on any Project Site that would subject any Seller or such Project Site to any liability under any applicable Environmental Laws, and (b) Sellers have all Permits required under applicable Environmental Laws and are in compliance in all material respects with all applicable Environmental Laws.  The conduct by Sellers of their business has not resulted in the Release of any Hazardous Substances for which any Sellers may have liability for investigation, remediation, damage claims or otherwise under applicable Environmental Laws.

4.13    Regulatory Matters.

(a)    Each of the Projects currently meets the design, technological, engineering and ownership criteria required to be classified as a Qualifying Facility. Attached as Schedule 4.13 is a true and complete copy of the no action letter (the "**No Action Letter**") issued by the Securities and Exchange Commission.  All of the assumptions and facts set forth in the No Action Letter are, and during all relevant times have been, true and correct with respect to the nature of the Sellers' use and ownership of the Projects.

(b)    No Seller is (i) subject to regulation as an "electric utility company," "public utility company" or "holding company" under PUHCA or under applicable state law; (ii) subject to regulation under the Federal Power Act of the United States, as amended, except as provided in 18 C.F.R. §292.601(c); or (iii) subject to regulation as an "electric utility," "electric corporation," "electrical company," "public utility," or "public service corporation" or the equivalent with respect to the rates of electric utilities or the financial and organizational regulation of electric utilities as under federal or applicable state law.

4.14    Insurance.

(a)    Schedule 4.14 discloses a complete and correct summary of the loss experience under each policy of insurance maintained by Sellers with respect to the Projects and the Purchased Assets.

(b)    (i) No Seller has been refused any insurance with respect to the Projects or the Purchased Assets nor has coverage been limited by any insurance carrier to which such Seller has applied for insurance during the last year, (ii) no Seller has received any notice from the insurer under any insurance policy covering any Project or any portion of the Purchased Assets disclaiming coverage, reserving rights with respect to a particular claim or policy in general or canceling or materially amending any such policy, and there is no claim, suit or other matter currently pending in respect of any Project or any portion of the Purchased Assets with respect to which any Seller has received such a notice, and (iii) to Sellers' knowledge, there is no occurrence for which any Project may be liable that would give rise to an insurance claim after the Closing Date.

4.15    Employee Matters.  Each Seller in compliance with all Applicable Laws respecting employment, employment practices, and terms and conditions of employment for any independent contractor or Person through or from whom it receives services.  No Seller is a party to nor is it bound by any collective bargaining agreement with respect to any employees assigned to the business of such Seller, and, to the knowledge of Sellers, no present union organizing efforts are underway with respect to any such employees and no claim has been made by any union as to the representation of such employees.  Except as set forth on Schedule 4.15, no Seller nor any of its ERISA Affiliates has ever maintained, sponsored, incurred direct or contingent liability under, or been a party or contributed to any Employee Benefit Plan applicable to employees generally.

4.16    Customers and Suppliers.  None of the Sellers is aware of any fact, condition or event, other than the announcement and consummation of the transactions contemplated hereby, that would adversely affect the relationship of Sellers with its customers.

4.17    Bulk Transfer.  Sellers' principal business is not the sale of inventory from stock within the meaning of Section 6103(a)(i) of the Uniform Commercial Code as enacted in the State of California, and the transactions contemplated by this Agreement are not subject to Article VI of the Uniform Commercial Code enacted in the State of California.

4.18    CapitalSource Consent.  Sellers have obtained the consent of CapitalSource Finance LLC, a true and complete copy of which is attached hereto as Exhibit G.

4.19    Disclosure.  No representation or warranty of any Seller in this Agreement and no statement in any Disclosure Schedule of any Seller omits to state a material fact necessary to make the statement herein or therein, in light of the circumstances in which they were made, not misleading.

4.20    Copies of Documents.  Each of the Sellers has provided Buyer reasonable access to true and complete copies of each document listed in the Disclosure Schedule.

4.21    Disclaimer of Other Representations and Warranties; Disclosure.

(a)    Sellers do not make, and have not made, any representations or warranties relating to Sellers or otherwise in connection with the transactions contemplated hereby other than those expressly set forth herein.  EXCEPT FOR THOSE EXPRESSLY SET FORTH HEREIN, SELLERS MAKE NO REPRESENTATION OR WARRANTY

WITH RESPECT TO THE PURCHASED ASSETS, WHICH ARE BEING SOLD AS IS, WHERE IS. SELLERS EXPRESSLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY, USE FOR PARTICULAR PURPOSE OR ANY OTHER WARRANTY WHATSOEVER, EXCEPTING SOLELY THE EXPRESS REPRESENTATIONS AND WARRANTIES INCLUDED IN THIS AGREEMENT.

      (b)    No Person has been authorized by Sellers to make any representation or warranty relating to Sellers in connection with the transactions contemplated hereby and, if made, such representation or warranty must not be relied upon as having been authorized by Sellers.

      (c)    Certain information set forth in the Disclosure Schedule is included solely for informational purposes and may not be required to be disclosed pursuant to this Agreement. The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by Sellers in this Agreement or that it is material, nor shall such information be deemed to establish a standard of materiality.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF BUYER

      Buyer represents and warrants to Sellers that the statements contained in this Article 5 are true and complete as of the date of this Agreement and will be true and complete as of the Closing Date, except as set forth in the Disclosure Schedule (provided, however, that each disclosure set forth in the Disclosure Schedule shall not be deemed to refer to any section other than (i) the specific section or sections referenced in such disclosure and (ii) any other sections where the applicability of the disclosed matter or circumstance to the representation or warranty in question is reasonably obvious):

      5.01    Corporate Existence and Authority of Buyer. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. All actions and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken. Assuming the due execution hereof by Sellers, this Agreement will constitute the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as enforceability may be limited by general equitable principles and by bankruptcy, insolvency, reorganization, debtor relief or similar laws affecting the rights of creditors generally.

      5.02    No Conflicts; Consents. The execution and delivery of this Agreement and the other transaction documents contemplated hereby do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, (a) conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, (i) any provision of the Certificate of Formation or Operating Agreement of Buyer, or (ii) any judgment, order, decree, Permit, statute, law, ordinance, rule or regulation applicable to Buyer; (b) conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or

acceleration of any material obligation or loss of a material benefit under, any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, agreement or arrangement to which Buyer is a party or by which Buyer is bound, or (c) result in the creation of any Encumbrance upon any of the Purchased Assets, in the case of clauses (a)(ii), (b) and (c), except as would not prevent Buyer from consummating the transactions contemplated by this Agreement. Except as set forth on Schedule 5.02, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Body or any Person is required to be obtained or made by or with respect to Buyer in connection with the execution, delivery and performance of this Agreement, the other transaction documents contemplated hereby or the consummation of the transactions contemplated hereby other than those that may be required solely as result of the specific regulatory status of any of the Sellers.

5.03    Availability of Funds.  Buyer has available to it, or will on the Closing Date have available to it, funds sufficient to enable it to consummate the transactions contemplated by this Agreement.

5.04    Acknowledgments by Buyer.  Buyer acknowledges and affirms that in connection with the transactions contemplated by this Agreement it has had access to the personnel, officers, professional advisors, operations and records of Sellers relating to the Purchased Assets and the Purchased Liabilities.  Buyer further acknowledges and affirms that, in making the decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely on (i) the representations, warranties, covenants and agreements of Sellers set forth in this Agreement and in the schedules and certificates delivered to Buyer at Closing, and (ii) except for the items referred to in subclause (i) above, its own independent investigation, analysis and evaluation of Sellers and their assets, business, financial condition, operations and prospects.

5.05    Brokers.  Buyer has not expressly or impliedly engaged any broker, finder or agent with respect to any transaction contemplated by this Agreement.

5.06    Litigation.  There are no actions, suits, proceedings, orders, or investigations pending or, to the knowledge of Buyer, threatened against or affecting Buyer at law or in equity, or before or by any court, arbitral or mediation panel, or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that would adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated hereby.

ARTICLE 6

TRANSACTIONS PRIOR TO CLOSING

6.01    Access.  Prior to the Closing, Sellers shall give Buyer and its representatives, employees, counsel and accountants reasonable access, during normal business hours and upon reasonable notice, to the Projects, for the purpose, among others, of verifying completion of Repairs in accordance with Section 2.06(b), the customers and suppliers of the Purchased Assets, the counterparties to each of the Contract Rights, the Assigned Leases and the Acquired Debt, the personnel, properties, books and records of Sellers relating to the

Projects; provided, however, that such access does not unreasonably disrupt the normal operations of Sellers. All such requests for such access shall be made to such representatives of Sellers as Sellers shall designate in writing.

6.02    Conduct Pending Closing. During the period from the date of execution of this Agreement through Closing, Sellers shall use commercially reasonable efforts to: (a) cause the operation of the Projects to be conducted in the ordinary course of business in substantially the manner in which heretofore conducted; (b) preserve intact Sellers' business organization and goodwill, and maintain satisfactory relationships with its customers and suppliers and other third Persons having business relationships with Sellers; (c) maintain and keep the Projects in as good repair and condition as at present, ordinary wear and tear excepted; (d) maintain the Permits and comply with Applicable Law; and (e) file the Form 556 (or other similar or substitute forms) with the FERC for each of the Projects set forth on Schedule 3.04(f). In addition, each Seller shall not, except with Buyer's prior written consent, do any of the following: (a) except as set forth on Schedule 6.02, sell, lease, exchange, mortgage, pledge, transfer or otherwise dispose of, or agree to sell, lease, exchange, mortgage, pledge, transfer or otherwise dispose of, any of its assets, except in the ordinary course of business and consistent with past practice (in amount and form), in each case excluding the Excluded Assets; or (b) take any action or fail to take any action that could be adverse to the business or operations of the Projects in any material respect, or to the ability of Sellers to consummate the transactions contemplated by this Agreement prior to or after the Closing, or that could reasonably be expected to adversely affect the ability of Sellers prior to the Closing to obtain consents of third parties or approvals of Governmental Bodies required to consummate the transactions contemplated by this Agreement.

6.03    Competing Transactions. During the period from the date of this Agreement through Closing, Sellers will not initiate, solicit, or encourage (including by way of furnishing information or assistance), or take any other action to facilitate, any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Competing Transaction, or enter into discussions or negotiate with any Person or entity in furtherance of any such Competing Transaction (regardless of the Person or party initiating contact), or agree to any Competing Transaction, or authorize or permit any of the officers, directors or employees of Sellers or any investment banker, financial advisor, attorney, accountant or other representative of Sellers to take any such action; provided, that Sellers shall be permitted to take or cause to be taken any actions in connection with a merger, consolidation, recapitalization or business combination or sale of equity securities to the extent that the taking of any such action would not prejudice the ability of Sellers to consummate the transactions contemplated by this Agreement.

6.04    Confidentiality. Buyer acknowledges that the information being provided to it in connection with the purchase and sale of the Purchased Assets and the consummation of the other transactions contemplated by this Agreement is subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference.

6.05    Consents.

(a)    The parties agree to use commercially reasonable efforts to take, or cause to be taken, all actions necessary (a) to obtain all necessary waivers, consents and

1099836 9                                             - 25 -

approvals from third parties set forth on Schedule 3.04(c), (b) to obtain all material consents, approvals and authorizations that are required to be obtained from any Governmental Body set forth on Schedule 3.04(c), (c) to prevent the entry of, or to lift or rescind, any order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement, and (d) to fulfill all conditions of this Agreement.

(b)    Buyer, on the one hand, and Sellers, on the other hand, shall use commercially reasonable efforts to provide all reasonable assistance to and shall cooperate with each other, to obtain the necessary waivers, consents and approvals and to bring about the consummation of the transactions contemplated by this Agreement in accordance with the terms and conditions hereof.

6.06    Public Announcements.  Buyer, on the one hand, and Sellers, on the other hand, agree that, from the date hereof, they will not make any public release or announcement concerning the transactions contemplated by this Agreement without the prior consent of the other, except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall notify the other party and allow the other party as much time as practicable to comment on such release or announcement in advance of its issuance.

6.07    Cooperation.  Buyer, on the one hand, and Sellers, on the other hand, shall reasonably cooperate with each other, and shall cause their officers, employees, agents, auditors and representatives to cooperate with each other, after the Closing to ensure the orderly transition of the Purchased Assets from Sellers to Buyer and to minimize any disruption to the business and operations of Sellers.

6.08    Nonsolicitation.  Buyer agrees not to solicit for employment and agrees not to hire any employees of Sellers for a period beginning on the date hereof and ending on the date that is one (1) year after the Closing Date.  For purposes of the foregoing, Buyer shall not be deemed to "solicit" employees of Sellers by making a general solicitation, or placing a general advertisement, for employment.

6.09    Updating.  Between the date of this Agreement and the Closing Date, Sellers or Buyer, as the case may be, will promptly notify the other party, and such other party will promptly acknowledge receipt of such notice, in writing if any Seller or Buyer, as the case may be, becomes aware of any fact or condition that causes or constitutes a breach of any of Sellers' or Buyer's, as the case may be, representations and warranties as of the date of this Agreement, or if Buyer or any Seller becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition.  Should any such fact or condition require any change in the Disclosure Schedules referenced in Article 4 or Article 5 if such Disclosure Schedules were dated the date of the occurrence or discovery of any such fact or condition, Sellers or Buyer, as applicable, will promptly deliver to the other party, a supplement to such Disclosure Schedule specifying such change.  During the same period, each of Sellers and Buyer, as the case may be, will promptly notify the other party of the occurrence of any breach of any

covenant of Sellers or Buyer, as the case may be, in this Agreement or of the occurrence of any event that may make the satisfaction of the conditions in Article 3 impossible or unlikely. Buyer or Sellers, as the case may be, may notify the other party that it or they will not accept such change to such Disclosure Schedule or will not waive any breach by the other party of any representation and warranty; provided, that in the event Buyer or Sellers, as the case may be, fails to respond to such change to the Disclosure Schedule, on or before Closing, then Buyer or Sellers, as the case may be, shall be deemed to have accepted such change to such Disclosure Schedule or waived any such breach by the party delivering such change, with respect to such representation and warranty.

6.10    Risk of Loss.

(a)    Between the date hereof and the Closing Date, all risk of loss or damage to the Purchased Assets and the Projects shall be borne by Sellers. Buyer acknowledges that from and after the Closing Date, Seller shall have no duty to purchase or maintain any insurance on or relating to the Purchased Assets.

(b)    If, before the Closing Date, all or any portion of any Project becomes subject to or is threatened with any condemnation or eminent domain proceeding or all or any portion of any Project is damaged or destroyed, Sellers shall notify Buyer promptly in writing of such fact. If such taking would reasonably be expected to result in a Material Adverse Effect, then Buyer may, at its option, (i) receive from the applicable Seller(s) an assignment of any claim, settlement, or proceeds with respect thereto (or with respect to a casualty loss, proceeds of any applicable insurance) to which such Seller(s) may be entitled and proceed with the transactions contemplated by this Agreement, or (ii) terminate this Agreement in the manner provided in Section 7.01 within twenty (20) days following such notice.

6.11    Inventory.

(a)    Prior to the Closing, Sellers shall give Buyer and its representatives and employees reasonable access, during normal business hours and upon reasonable notice, to the Inventory, for the purpose of inspecting the Inventory. All such requests for such access shall be made to such representatives of Sellers as Sellers shall designate in writing.

(b)    If, as of the Closing, any item of Inventory is missing or damaged or any operating component of a particular item of Inventory is missing, then Buyer and Sellers shall mutually agree on a reduction to the Purchase Price in respect of such missing or damaged item of Inventory or operating component.

ARTICLE 7

TERMINATION

7.01    Termination. This Agreement may, by written notice given at or prior to the Closing in the manner hereinafter provided, be terminated and the transactions contemplated hereby abandoned:

(a)    By mutual consent of Sellers and Buyer;

(b)    By either of Buyer or Sellers, if the Closing does not occur on or prior to the date that is ninety (90) days after the date hereof, and if the failure to consummate the transactions contemplated by this Agreement on or before such date did not result from the failure by the party seeking termination to fulfill any undertaking or commitment provided for herein that is required to be fulfilled prior to Closing; provided, however, that the parties shall use their commercially reasonable efforts to cause the Closing to occur on or before May 31, 2004;

(c)    By Buyer, upon the breach in any material respect of any of the representations and warranties of any Seller contained herein or the failure by any Seller to perform and comply in any material respect with any of the agreements and obligations required by this Agreement to be performed or complied with by such Seller, if such breach or failure is not cured within ten (10) days of a Seller's receipt of a written notice from Buyer that such a breach or failure has occurred; or

(d)    by Sellers, upon the breach in any material respect of any of the representations and warranties of Buyer contained herein or the failure by Buyer to perform and comply in any material respect with any of the agreements and obligations required by this Agreement to be performed or complied with by it, provided that such breach or failure is not cured within ten (10) days of Buyer's receipt of a written notice from Sellers that such a breach or failure has occurred;

provided, that notwithstanding anything to the contrary in this Agreement, the right to terminate this Agreement pursuant to Sections 7.01(b), (c) or (d) shall not be available to any party whose failure to fulfill its obligations or to comply in any material respect with its covenants under this Agreement has been the cause of, or resulted in, the failure to satisfy a condition set forth in Section 3.

7.02    Effect of Termination. In the event of a termination by Sellers or Buyer pursuant to Section 7.01, written notice thereof shall be given to the other party and this Agreement shall, upon the receipt of such notice, immediately terminate and become void and have no further legal force or effect without further action by either party, except that the provisions of Section 9.02 shall survive the termination of this Agreement. If the transactions contemplated by this Agreement are terminated as provided herein:

(a)    Buyer shall return to Sellers (or certify as to the destruction of ) all documents and other material received from Sellers or any of their employees, officers,

directors, agents or representatives relating to the transactions contemplated hereby and all copies of the foregoing; and

(b)    All confidential information received by Buyer with respect to the business of Sellers shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

Nothing in this Article 7 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement.

ARTICLE 8

POST-CLOSING TRANSACTIONS

8.01    Access to Personnel and Books and Records.  After the Closing, upon reasonable written notice, each party hereto shall furnish or cause to be furnished to the other parties hereto and their employees, counsel, auditors and representatives access, during normal business hours, to such personnel and information (including books and records that were transferred to Buyer pursuant to this Agreement) as is reasonably necessary for financial reporting and accounting matters of the requesting party and any of their affiliates, the preparation and filing of any Tax Returns, reports or forms or the defense of any Tax claim or assessment, or to investigate, defend against, or otherwise oppose any pending or threatened claim against the requesting party or any of their affiliates in connection with their businesses or operations.  Each party hereto agrees to use its commercially reasonable efforts to properly retain and maintain such records until the expiration of the statute of limitations applicable to the subject matter of such information.  Neither party shall be required to take any action that would unreasonably interfere with the conduct of its business or unreasonably disrupt its normal operations.

8.02    Access to Projects and Purchased Assets.  During the Post-Closing Access Period, upon reasonable written notice, Buyer shall permit Sellers' employees, officers, directors and representatives, and any other persons designated by Sellers and accompanied by Sellers' employees, officers, directors or representatives, to have access and visitation rights, during normal business hours, to the Projects and the Purchased Assets; provided, that the foregoing access and visitation rights shall become limited so as to apply to only four (4) Projects, which Projects shall be selected by Sellers in their sole discretion, on the later of (i) the date that is one year after the Closing Date and (ii) the date on which Sellers (or their affiliates) first own or lease, and operate, at least five (5) projects for which there has been successful completion of pre-parallel testing.  The "Post-Closing Access Period" shall mean the period beginning on the Closing Date and ending on the date that is three (3) years after the Closing Date.

8.03    Further Assurances.

(a)    From time to time, as and when requested by any party hereto, the other party or parties, as applicable, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such

1099836 9

- 29 -

actions as may be reasonably necessary to consummate the transactions contemplated by this Agreement.

(b)    Without limiting the generality of the foregoing, Buyer shall use its commercially reasonable efforts to assist Sellers in obtaining any Rebates that Sellers are retaining pursuant to this Agreement, including, without limitation, (i) assisting Sellers in conducting and providing the results of initial source tests in a timely manner, (ii) obtaining the Permit to operate from the relevant air district necessary to satisfy any Rebate program requirements and (iii) cooperating with Seller to achieve a passing project inspection with the Rebate administrators; provided, that in no event shall Buyer be required to shut down or curtail operation of any Project or make any capital expenditure, modification or improvement (irrespective of whether at Buyer's or Sellers' cost and expense) to any of the Projects in connection with providing such assistance hereunder, except for any routine or normal maintenance required to ensure that the relevant Project is operating as designed at the time of the inspection by the Rebate administrators.  Buyer also agrees that if and to the extent that it shall receive any Rebates to which Sellers are entitled pursuant to this Agreement, it shall remit such Rebates to Sellers as soon as practicable but in no event later than ten (10) days of after receipt thereof.

8.04    Intellectual Property; Remote Monitoring Services; License of Certain Intellectual Property.

(a)    The parties acknowledge that, as provided in Section 2.02(g), the Purchased Assets do not include any interest in intellectual property rights owned or licensed by Sellers (including, without limitation, patents and patent applications).  Additionally, the parties acknowledge that, as provided in Section 2.02(i), the Purchased Assets do not include certain telecommunications access and equipment and Sellers' protocol converter boxes located at the Projects (which are utilized in remote monitoring of operations at the Projects, and reflect Sellers' intellectual property).

(b)    For up to six (6) months following the Closing, Sellers will, at the request of Buyer, provide remote monitoring services to Buyer with respect to the Projects, utilizing, among other things, the Excluded Assets referred to in Section 8.04(a). Additionally, Sellers agree, upon the request of Buyer, to create a data interface for monitoring data concerning the Projects, such that Sellers will be able to make electronic transmission of such data to Buyer.  Buyer shall pay to Sellers (a) at Closing, an amount equal to Sellers' actual out-of-pocket costs and expenses (to be supported by invoices or other supporting documentation) in connection with the creation and initial setup of the data interface, not to exceed $10,000, and (b) a fee of $10,000 per month, plus Sellers' out-of-pocket telecommunication costs and expenses, including, without limitation, phone, internet and DSL charges (to be supported by invoices or other supporting documentation), payable monthly in arrears, for remote monitoring services.  To the extent transferable, Seller shall, upon the conclusion of Sellers' remote monitoring services to Buyer, transition all non-proprietary phone, internet, DSL and other telecommunications networks as directed by Buyer.  Upon the conclusion of Sellers' provision of remote monitoring services to Buyer, Buyer shall immediately permit Sellers to retrieve the protocol converter boxes from the Project premises.

(c)    Effective as of the Closing Date, Sellers grant to Buyer a non-exclusive, non-assignable, perpetual, paid-up right and license (with no right to grant any sublicenses) to use the Licensed Intellectual Property solely in connection with the operation of the Projects. "**Licensed Intellectual Property**" shall mean all proprietary engineering information, specifications, designs, drawings, and processes used in connection with the construction and operation by Sellers of the Projects (other than the matters referred to in Sections 8.04(a) and 8.04(b) above). Sellers shall provide copies of such Licensed Intellectual Property (as applicable) to Buyer.

8.05    Corporate Identity. Buyer acknowledges and agrees that it is not acquiring any rights to use the trade names and trademarks "RealEnergy," or any other name or mark owned by Sellers and that Sellers shall retain title to, and all other rights in, those names and marks. Buyer shall cease using any stationery, business cards, advertising literature or any other materials that include any names or marks owned by Sellers effective as of the Closing.

8.06    Interconnection Agreements. If after the Closing, any Seller remains a party to, or otherwise remains liable under, any of the interconnection agreements included in the Contract Rights (the "**Continuing Interconnection Agreements**"), then Buyer shall, as promptly as possible but in any event within nine (9) months after the Closing, enter into new interconnection agreements that will replace such Continuing Interconnection Agreements and shall, without limiting the foregoing, use commercially reasonable efforts to assist such Seller in terminating such Continuing Interconnection Agreements, novating such Seller out of the applicable Continuing Interconnection Agreement or otherwise eliminating such Seller as a party thereto. In any event, Buyer agrees to indemnify Sellers and hold them harmless from and against any and all actions, suits, proceedings, amounts paid in settlement, claims, liabilities, demands, assessments, judgments, losses, damages and deficiencies arising as a result of facts or circumstances pertaining to the Continuing Interconnection Agreements from and after the Closing; provided, that with respect to the Market Street Project, such indemnification shall be from and after the date on which both of the following have occurred: (i) an interconnection agreement for the Market Street Project has been obtained and (ii) the Market Street Project has been transferred to Buyer.

ARTICLE 9

MISCELLANEOUS

9.01    Survival of Representations and Warranties. Except as set forth in the next sentence, the representations and warranties contained in this Agreement, the Disclosure Schedule and any other certificate or document delivered pursuant to this Agreement shall expire upon the Closing. Notwithstanding the foregoing, the representations and warranties in (a) Sections 4.04 and 4.05 shall survive for a period of two (2) years following the Closing Date and (b) Section 4.09 shall survive for the applicable statute of limitations plus ninety (90) days.

9.02    Expenses and Fees. Buyer, on the one hand, and Sellers, on the other hand, shall pay their own expenses (including all legal, accounting, broker, finder and investment banker fees) relating to this Agreement, the negotiations leading up to this Agreement and

1099836.9

- 31 -

the transactions contemplated by this Agreement; provided, that Sellers shall pay the costs and expenses, including without limitation, attorneys' fees of, any Person in connection with obtaining the consent of such Person described in Sections 3.04(c) and 3.05(c); provided, that with respect to the consent of the holders of the Acquired Debt, Sellers shall only pay up to an aggregate of $10,000 in costs and expenses, and any costs and expenses in excess of $10,000 in the aggregate shall be borne entirely by Buyer.

9.03    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that no party may assign its rights or delegate its obligations hereunder (including, with respect to Buyer, by operation of law in connection with a merger, or sale of substantially all the assets of Buyer) without the prior written consent of the other party hereto. Notwithstanding the foregoing, Buyer may assign its rights and delegate its obligations hereunder, provided that such assignment or delegation does not relieve Buyer of its obligations hereunder.

9.04    Amendments.  This Agreement may not be amended or modified other than by a writing executed by all parties hereto.

9.05    Notices.  All notices, requests, demands or other communications made in connection with this Agreement shall be in writing and shall be deemed to have been duly given on the date delivered, if delivered personally or sent by telecopier or facsimile machine to the persons identified below, or three days after mailing in the U.S. mail if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as follows, or one (1) Business Day after mailing by overnight courier, addressed as follows:

| | |
|---|---|
| if to Sellers: | c/o RealEnergy, Inc.<br>John Paul<br>Chief Executive Officer<br>5957 Variel Avenue<br>Woodland Hills, California 91367<br>Telephone:  (818) 610-2300<br>Facsimile:  (818) 596-5585 |
| with a copy to: | Anthony T. Iler, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars, Suite 900<br>Los Angeles, California 90067<br>Telephone:  (310) 277-1010<br>Facsimile:  (310) 203-7199 |
| if to Buyer | Steven Mueller<br>DG Cogen Partners, LLC<br>c/o DG Energy Solutions LLC<br>733 Eighth Avenue<br>San Diego, CA  92101<br>Telephone:  (619) 232-6564<br>Facsimile:  (619) 232-6116 |

with copy to:      John Tisdale, Esq.
                          ArcLight Capital Partners, LLC
                          200 Clarendon Street, 21st Floor
                          Boston, MA 02117
                          Telephone: (617) 531-6316
                          Facsimile: (617) 867-4698

with a copy to:      John D. Hawkins, Esq.
                          Paul Hastings Janofsky & Walker, LLP
                          1055 Washington Blvd.
                          Stamford, Connecticut 06901
                          Telephone: (203) 961-7509
                          Facsimile: (203) 359-3031

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this Section 9.05.

9.06    Headings, Exhibits and Disclosure Schedules. The headings contained in this Agreement, in any Exhibit or Disclosure Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any matter set forth in any provision, subprovision, section or subsection of the Disclosure Schedule hereto shall be deemed set forth for all purposes of the Disclosure Schedule to the extent relevant. All Exhibits and the Disclosure Schedule annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Disclosure Schedule or Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.

9.07    Construction. The parties acknowledge that they have participated jointly in the negotiating and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement.

9.08    Severability. Any term or provision of this Agreement that shall be held invalid, illegal or unenforceable in any respect shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

9.09    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law.

1099836.9

- 33 -

9.10    <u>Dispute Resolution</u>.

(a)    All disputes, claims, or controversies arising out of or relating to this Agreement or any other agreement executed and delivered pursuant to this Agreement or the negotiation, validity or performance hereof and thereof or the transactions contemplated hereby and thereby that are not resolved by mutual agreement shall be resolved solely and exclusively by binding arbitration to be conducted before the American Arbitration Association or its successor ("**AAA**"). The arbitration shall be held in New York, New York, before a single arbitrator and shall be conducted in accordance with the rules and regulations promulgated by AAA unless specifically modified herein.

(b)    The parties covenant and agree that the arbitration shall commence within thirty (30) days of the date on which any party files a written demand for arbitration hereto. In connection with the arbitration proceeding, the arbitrator shall have the power to order the production of documents by each party and any third-party witnesses. In addition, each party may take up to three depositions as of right, and the arbitrator may in his or her discretion allow additional depositions upon good cause shown by the moving party. However, the arbitrator shall not have the power to order the answering of interrogatories or the response to requests for admission. In connection with any arbitration, each party shall provide to the other, no later than seven (7) Business Days before the date of the arbitration, the identity of all persons that may testify at the arbitration and a copy of all documents that may be introduced at the arbitration or considered or used by a party's witness or expert. The arbitrator's decision and award shall be made and delivered within sixty (60) days of the selection of the arbitrator. The arbitrator's decision shall set forth a reasoned basis for any award of damages or finding of liability. The arbitrator shall not have the power to award damages in excess of actual compensatory damages and shall not multiply actual damages or award punitive damages or any other damages that are specifically excluded under this Agreement, and each party hereby irrevocably waives any claim to such damages.

(c)    The parties covenant and agree that they will participate in the arbitration in good faith, that they will share equally the fees and expenses of AAA and that they will each bear their own attorneys' fees and expenses, except as otherwise provided herein. The arbitrator may in his or her discretion assess costs and expenses (including the reasonable attorneys' fees and expenses of the prevailing party) against any party to a proceeding. Any party unsuccessfully refusing to comply with an order of the arbitrators shall be liable for costs and expenses, including attorneys' fees, incurred by the other party in enforcing the award. This <u>Section 9.10</u> applies equally to requests for temporary, preliminary or permanent injunctive relief, except that in the case of temporary or preliminary injunctive relief any party may proceed in court without prior arbitration for the limited purpose of avoiding immediate and irreparable harm. The provisions of this <u>Section 9.10</u> shall be enforceable in any court of competent jurisdiction. The prevailing party in any action for injunctive relief will be entitled to payment of reasonable attorneys' fees and expenses.

(d)    Each of the parties hereto irrevocably and unconditionally consents to the exclusive jurisdiction of AAA to resolve all disputes, claims or controversies arising out of or relating to this Agreement or any other agreement executed and delivered pursuant to this Agreement or the negotiation, validity or performance hereof and thereof or the

1099836.9

transactions contemplated hereby and thereby and further consents to the jurisdiction of the courts of New York for the purposes of enforcing the arbitration provisions of this Section 9.10. Each party further irrevocably waives any objection to proceeding before AAA based upon lack of personal jurisdiction or to the laying of the venue and further irrevocably and unconditionally waives and agrees not to make a claim in any court that arbitration before AAA has been brought in an inconvenient forum. Each of the parties hereto hereby consents to service of process by registered mail at the address to which notices are to be given. Each of the parties hereto agrees that its or his submission to jurisdiction and its or his consent to service of process by mail are made for the express benefit of the other parties hereto.

9.11    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

9.12    No Consequential Damages.  No party to this Agreement shall have any liability hereunder for any indirect or consequential damages.

9.13    Entire Agreement.  This Agreement and the Confidentiality Agreement contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.  Neither party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Confidentiality Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

REALENERGY, INC.

By: _____

Name: JOHN F. PAUL

Title: CEO

DG COGEN PARTNERS, LLC

By: _____

Name: _____

Title: _____

REALENERGY PROJECTS I, LLC

By: _____

Name: JOHN F. PAUL

Title: manager

REALENERGY PROJECTS II, LLC

By: _____

Name: JOHN F. PAUL

Title: manager

The undersigned hereby guarantees the payment when due of Buyer's obligation to pay the Purchase Price if, as and when provided in this Agreement. This is a guaranty of payment and not of collection. In addition, the undersigned hereby waives any and all defenses or benefits that may be derived from or afforded by law that limit the liability of or exonerate a Person solely in its capacity as a guarantor or surety, other than payment in full of the Purchase Price by Buyer.

ARCLIGHT ENERGY PARTNERS FUND I, L.P.

By: ArcLight PEF GP I, LLC, its general partner

By: _____

Name: _____

Title: _____

1099836

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

REALENERGY, INC.                          DG COGEN PARTNERS, LLC

By:_____              By:_____

Name:_____             Name: Steven Jay Mueller

Title:_____             Title: President


REALENERGY PROJECTS I, LLC        The undersigned hereby guarantees the
                                  payment when due of Buyer's obligation to
By:_____      pay the Purchase Price if, as and when
                                  provided in this Agreement. This is a
Name:_____      guaranty of payment and not of collection.
                                  In addition, the undersigned hereby waives
Title:_____      any and all defenses or benefits that may be
                                  derived from or afforded by law that limit
                                  the liability of or exonerate a Person solely
                                  in its capacity as a guarantor or surety,
REALENERGY PROJECTS II, LLC       other than payment in full of the Purchase
                                  Price by Buyer.
By:_____
                                  ARCLIGHT ENERGY PARTNERS
Name:_____      FUND I, L.P.

Title:_____
                                  By: ArcLight PEF GP I, LLC, its general
                                  partner

                                  By:_____

                                  Name:_____

                                  Title:_____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

REALENERGY, INC.

By:_____

Name:_____

Title:_____


DG COGEN PARTNERS, LLC

By:_____

Name:_____

Title:_____


REALENERGY PROJECTS I, LLC

By:_____

Name:_____

Title:_____


REALENERGY PROJECTS II, LLC

By:_____

Name:_____

Title:_____


The undersigned hereby guarantees the payment when due of Buyer's obligation to pay the Purchase Price if, as and when provided in this Agreement. This is a guaranty of payment and not of collection. In addition, the undersigned hereby waives any and all defenses or benefits that may be derived from or afforded by law that limit the liability of or exonerate a Person solely in its capacity as a guarantor or surety, other than payment in full of the Purchase Price by Buyer.

ARCLIGHT ENERGY PARTNERS FUND I, L.P.

By: ArcLight PEF GP I, LLC, its general partner

By:_____

Name: _Daniel R. Revers_

Title: _Manager_

# EXHIBIT A

## BILL OF SALE AND INSTRUMENT OF ASSIGNMENT

## BILL OF SALE AND INSTRUMENT OF ASSIGNMENT

THIS BILL OF SALE AND INSTRUMENT OF ASSIGNMENT (this "**Instrument**"), dated as of _____, 2004, is made by RealEnergy, Inc., a Delaware corporation ("**RealEnergy**"), RealEnergy Projects I LLC, a Delaware limited liability company ("**RE Projects I**"), and RealEnergy Projects II, LLC, a Delaware limited liability company ("**RE Projects II**, and, collectively with RealEnergy and RE Projects I, "**Sellers**"), with reference to the following facts:

    A.    Pursuant to the Asset Purchase Agreement, dated as of April 27, 2004 (the "**Purchase Agreement**"), by and among Sellers and DG Cogen Partners, LLC ("**Buyer**"), Buyer has agreed, subject to the terms and conditions set forth therein, to purchase the Purchased Assets in exchange for the consideration set forth in the Purchase Agreement, including the assumption of the Purchased Liabilities. All capitalized terms used herein but not otherwise defined herein have the meanings set forth in the Purchase Agreement.

    B.    This Instrument is intended to effect the transfer of the Purchased Assets from Sellers to Purchaser, pursuant to the terms and conditions hereinafter provided.

1.    Transfer of Assets.

    In consideration of Buyer's payment of the consideration set forth in the Purchase Agreement (including the assumption of the Purchased Liabilities), the receipt and sufficiency of which are hereby acknowledged by Sellers, subject to the exceptions provided in Section 2 hereof, Sellers hereby sell, convey, assign and transfer to Buyer, free and clear of any and all Encumbrances, except for Permitted Encumbrances, all right, title and interest in and to the following properties and assets (the "**Purchased Assets**"):

    (a)    Fixed Assets and Other Personal Property. All generators, turbines, HVAC systems, metering equipment, machinery, equipment and other fixed assets and tangible personal property used or held for use primarily in relation to the Projects or that are located at the premises of the Projects or otherwise set forth on Schedule 2.01(a) of the Purchase Agreement;

    (b)    Leased Property. All real property leased by Sellers and personal property leased by or licensed to Sellers, in each case, in connection with the Projects and that are set forth on Schedule 2.01(b) of the Purchase Agreement (collectively, "**Assigned Leases**");

    (c)    Permits. To the extent transferable, all licenses, permits, orders, franchises, certificates and approvals of or issued by any Governmental Body that are owned or held by, or that otherwise have been granted to or for the benefit of, any Sellers and that relate to the operation of the Projects, including, without limitation, those set forth on Schedule 2.01(c) of the Purchase Agreement;

    (d)    Contract Rights. All right, title and interest of Sellers in, to and under all of the contracts, leases, agreements, commitments, guaranties, warranties and all other legally binding arrangements, to which any Seller is party or by which any Seller is bound

relating to the Projects and that are set forth on Schedule 2.01(d) of the Purchase Agreement;

(e)    Books and Records.  The business records of Sellers primarily related to the Projects or to the Purchased Assets, whether in hard, copy, electronic or other form, including, without limitation, all training materials, sales and promotional literature, manuals of data, sales and purchase correspondence, contractor change orders, historical sales records and data, customer lists, supplier lists, catalogues; provided, however, that, Sellers may, at their sole cost and expense, make and retain copies of any Project Records;

(f)    Intellectual Property.  To the extent transferable, any third party proprietary software and other intellectual property and proprietary rights embodied in or reflected in the Purchased Assets described in subsection (a) of this Section 1;

(g)    Keys; Access Codes.  All sets of keys to the Projects, any access or security codes and any reports, manuals and warranties relating to any security devices or alarm systems relating to the Projects;

(h)    Viceroy Account.  The account receivable owed by Roscoe Real Estate, LP, or its successors, in connection with Pacific Shores (Viceroy) 1819 Ocean Avenue, Santa Monica (the "**Viceroy Account**");

(i)    Inventory.  All inventory set forth on Schedule 2.01(i) of the Purchase Agreement;

(j)    Arden Prepaid Access Fees.  The prepaid access fees relating to the following Projects: 100 Oceangate, Long Beach, California; 9333 & 9339 Genesee Avenue, San Diego, California; 701 B Street, San Diego, California; and 9325 & 9275 Sky Park, San Diego, California (collectively, the "**Arden Prepaid Access Fees**"); and

(k)    Other Claims.  All rights, claims and causes of action that Sellers may have relating to the Projects, the Purchased Assets or the Purchased Liabilities, including without limitation, all rights of Sellers under or pursuant to all warranties, representations, guarantees and service agreements, if any, made by suppliers, manufacturers and contractors in connection with products sold or services provided to Sellers for the Projects, the Purchased Assets or the Purchased Liabilities, in each case, to the extent, and only to the extent, that such rights, claims and causes of action arise out of events occurring after the Closing Date.

**[To carve out transfer of title to Market Street Project and all Purchased Assets related thereto if there is holdback.]**

2.    Excluded Assets.

Notwithstanding anything to the contrary contained in Section 1 hereof, Sellers shall not sell, assign, transfer, convey or deliver to Buyer any of the following:

(a)    Cash and Cash Equivalents.  Any cash, certificates of deposit, or other cash equivalents items;

1118193 1

      (b)    Accounts Receivable and Other Assets. (i) All accounts receivable, notes receivable, credits, prepaid expenses, deferred charges, advance payments, security and other deposits and prepaid items in existence as of the Closing Date other than the Viceroy Account and the Arden Prepaid Access Fees (collectively, the "**Retained Accounts**"), and (ii) all rights to causes of action, lawsuits, judgments, claims and demands relating to the Retained Accounts;

      (c)    Books and Records. All of the stock record books and minute books of Sellers and similar corporate records required by law to be retained by Sellers and any other books and records of Sellers other than the Project Records;

      (d)    Tax Refunds and Credits; Rebates. (i) All claims for Tax refunds and Tax credits attributable to a Pre-Closing Tax Period, and (ii) all claims for rebates, including, without limitation, rebates under governmentally sponsored programs relating to "clean" or renewable energy of any kind;

      (e)    Insurance Claims and Proceeds. All insurance claims and proceeds under insurance policies of Sellers;

      (f)    Employee Benefit Plans. All rights of Sellers under, and all funds and property held in trust pursuant to, any Employee Benefit Plans applicable to any employees of Sellers;

      (g)    Intellectual Property. Any and all patents, trademarks (registered or unregistered), trade names, copyrights, proprietary software and service marks and other intellectual property and proprietary rights, whether or not subject to statutory registration or protection, owned, used, filed by or licensed to any Seller other than intellectual property described in Section 1(f) hereof;

      (h)    Contracts. (i) All real property and personal property leased by Sellers other than the Assigned Leases and (ii) all contracts, agreements, commitments and other legally binding arrangements of Sellers or binding the assets of Sellers other than the Contracts Rights;

      (i)    Remote Monitoring Equipment. Phone lines, DSL lines, computer hardware, servers, software and related telecommunications access and equipment and Sellers' protocol converter boxes located at the Projects (provided, however, that Buyer will be permitted to utilize these assets to the extent provided in Section 8.04(b) of the Purchase Agreement); and

      (j)    Other Claims. All rights, claims and causes of action relating to the Projects or the Purchased Assets to the extent that such rights, claims and causes of action relate to periods, or arise out of events occurring, prior to the Closing.

3.    Miscellaneous.

    3.1    Headings. The headings contained in this Instrument are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

1118193 1

3.2    Further Assurances.    Sellers agree to execute such other and further documents and to do such other and further acts as may be reasonably required to effectuate the intent of the parties and carry out the terms and provisions of this Instrument. From time to time after the date hereof, at Buyer's request and expense but without further consideration, Sellers will execute and deliver such other instruments of conveyance, assignment, transfer and delivery and take such other action as Buyer reasonably may request in order more effectively to transfer, convey, assign and deliver the Purchased Assets to Buyer.

3.3    Governing Law.

This Instrument shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law.

3.4    Counterparts.

This Instrument may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same Instrument.

**[SIGNATURE PAGE TO BILL OF SALE AND INSTRUMENT OF ASSIGNMENT]**

IN WITNESS WHEREOF, this Instrument has been duly executed by Sellers as of the date first above written.

**SELLERS**

REALENERGY, INC.

By_____

    Name:

    Title:

REALENERGY PROJECTS I LLC

By_____

    Name:

    Title:

REALENERGY PROJECTS II LLC

By_____

    Name:

    Title:

EXHIBIT B

SIDE LETTER

**[TO BE DELIVERED AT CLOSING]**

_____, 2004

DG Cogen Partners, LLC
733 Eighth Avenue
San Diego, CA 92101
Attention: Steven Mueller

Ladies and Gentlemen:

This letter is in reference to the Asset Purchase Agreement (the "Purchase Agreement"), dated as of April 27, 2004, by and among RealEnergy, Inc., a Delaware corporation ("RealEnergy"), RealEnergy Projects I LLC, a Delaware limited liability company ("RealEnergy I"), RealEnergy Projects II LLC, a Delaware limited liability company ("RealEnergy II," and, collectively, with RealEnergy and RealEnergy I, the "Sellers"), and DG Cogen Partners, LLC, a Delaware limited liability company ("Buyer"). The undersigned, OCM/GFI Power Opportunities Fund, L.P. ("Power Fund") and Global Innovation Partners, LLC ("GIP," and, collectively with the Power Fund the "Guarantors") have entered into Guaranties, each dated as of June 11, 2003, pursuant to which they each have guaranteed a portion of the obligations of RealEnergy under the Revolving Credit Agreement, dated as of June 11, 2003 (as amended, restated or supplemented the "Credit Facility"). In connection with the Purchase Agreement, the Guarantors hereby agree as set forth herein (capitalized terms used herein without definition have the respective meanings given to them in the Purchase Agreement).

1.    Each of the Guarantors hereby agrees that it shall not, and waives any right to, at any time, whether in its capacity as a shareholder or holder of any note or debt instrument issued by Sellers or as a guarantor under the Credit Facility, or whether as a lender under the Credit Facility from and after the date on which it is an assignee of or successor in interest to or becomes subrogated to the rights of the current lenders under the Credit Facility, commence, join in or prosecute a fraudulent conveyance action under state or federal law (including, without limitation, the federal Bankruptcy Code) against Buyer or Sellers as a result of the consummation of the transactions contemplated by the Purchase Agreement. In addition, each Guarantor hereby releases any lien or security interest that it may have had in the Purchased Assets and authorizes Buyer or Sellers to file UCC partial releases or amendment statements to reflect such release of any lien or security interest on the Purchased Assets.

2.    This letter shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law.

3.    This letter may be signed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

1117590.3

Please execute this letter in the space below to signify your agreement to the foregoing.

OCM/GFI Power Opportunities Fund, L.P.

By:  GFI Energy Ventures LLC,
     its general partner

By: _____
     Name:
     Title:

Global Innovation Partners, LLC

By: Global Innovation Manager, LLC,
     its manager

By:_____
     Name:
     Title:

ACKNOWLEDGED

DG Cogen Partners, LLC

By:_____
     Name:
     Title:

1117590 3

- 2 -

**EXHIBIT C**

**OPINION OF IRELL & MANELLA LLP**

EXHIBIT C

_____, 2004

DG Cogen Partners, LLC
733 Eighth Avenue
San Diego, CA 92101
Attn: Steven Mueller

Re:   RealEnergy, Inc., RealEnergy Projects I LLC and RealEnergy Projects II
      LLC

Ladies and Gentlemen:

        We have acted as counsel to RealEnergy, Inc., a Delaware corporation
("**RealEnergy**"), RealEnergy Projects I, LLC, a Delaware limited liability company ("**RE
Projects I**"), and RealEnergy Projects II LLC, a Delaware limited liability company ("**RE
Projects II**," and, collectively with RealEnergy and RE Projects I, the "**Sellers**"), in
connection with the Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of
April 27, 2004, by and among RealEnergy, RE Projects I, RE Projects II, and DG Cogen
Partners, LLC, a Delaware limited liability company ("**Buyer**"), and the transactions
contemplated thereby. Capitalized terms used herein and not otherwise defined herein shall
have the respective meanings ascribed to such terms in the Purchase Agreement.

        For the purpose of rendering this opinion, we have reviewed the following
documents (collectively, the "**Transaction Documents**"):

        (a)    the Purchase Agreement;

        (b)    the Bill of Sale and Instrument of Assignment, dated as of the date hereof,
               made by Sellers for the benefit of Buyer; and

        (c)    the Instrument of Assumption, dated as of the date hereof, executed by Buyer
               for the benefit of Sellers.

        In addition, we have made such investigations of law and have examined such
certificates of public officials and officers and directors of the Sellers as we have considered
necessary for purposes of this opinion. We also have reviewed such other matters and
documents as we have deemed necessary or relevant as a basis for this opinion. In our
review, we have assumed, without investigation, the legal capacity of all natural persons
signing documents in their respective individual or official capacities, the genuineness of all
signatures, the authenticity of all documents submitted to us as originals, the conformity to

1116487.3

DG Cogen Partners, LLC
_____, 2004
Page 2

original documents of all documents submitted to us as certified or reproduction copies, the authenticity of the originals of such copies and the absence of any amendment, modification, waiver, agreement or understanding of any nature between or among the parties to the Transaction Documents as reviewed by us that would change, alter or otherwise affect the terms of such documents. We also have relied upon the accuracy of the aforementioned certificates of public officials and, as to certain matters of fact, certificates of officers and directors of the Sellers and the representations and warranties of the parties (as to factual matters) contained in the Transaction Documents. Specifically, with respect to our opinions regarding the good standing of each Seller under the laws of its jurisdiction of formation and its qualification to do business as a foreign corporation in the jurisdictions listed on Schedule I attached hereto, we have relied solely upon a review of a certificate, dated as of the date set forth on Schedule I, of the Secretary of State of each such jurisdiction. Our opinions regarding such matters are accordingly as of the dates of such certificates, and we have undertaken no investigation of such matters after the dates of such respective certificates. Further, we have assumed (i) the due authorization, execution and delivery of the Transaction Documents, and all agreements and instruments executed in connection therewith, by all parties thereto (other than Sellers), and (ii) that such documents are valid and binding obligations of such parties (other than with respect to the Sellers).

Based upon the foregoing, and on the assumptions herein set forth, and subject to the limitations, qualifications and exceptions set forth herein, we are of the opinion that:

1.      RealEnergy is a corporation, and each of RE Projects I and RE Projects II is a limited liability company, validly existing and in good standing under the laws of the State of Delaware. Each Seller is duly qualified and in good standing to do business as a foreign corporation or limited liability company, as applicable, in each jurisdiction set forth on Schedule I attached hereto. Each Seller has full corporate, or limited liability company, as applicable, power and authority to execute and deliver the Transaction Documents to which such Seller is a party and to perform its respective obligations thereunder.

2.      All corporate, or limited liability company, as applicable, actions and other proceedings required to be taken by each Seller to authorize the execution, delivery and performance of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby have been duly and properly taken.

3.      Each of the Transaction Documents to which a Seller is party constitutes a legal, valid and binding obligation of such Seller.

4.      The execution and delivery of the Transaction Documents do not, and the consummation of the transactions contemplated thereby and compliance with the terms thereof will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, (a) any provision of the Certificate of Incorporation, Certificate of Formation, Bylaws or Operating Agreement, as applicable, of any Seller, or (b) (i) any judgment, order or decree known to us to be applicable to any of the Sellers, or (ii) any statute, law, ordinance, rule or regulation applicable to any Seller or the Purchased

DG Cogen Partners, LLC
_ _____, 2004
Page 3

Assets that in our experience is customarily directly applicable to the transactions of the nature contemplated by the Transaction Documents, in the case of clause (b)(ii) above, except as would not constitute a Material Adverse Effect.

The opinions expressed herein are subject to the qualification that enforceability of the Transaction Documents may be limited by (i) applicable bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent conveyance and transfer, and other laws and legal principles of general application relating to or affecting the rights and remedies of creditors, and (ii) by general principles of equity (whether applied in a proceeding at law or in equity), including, without limitation, principles of materiality, reasonableness, good faith and fair dealing, and the application of equitable principles to limit the availability of equitable remedies, such as specific performance of remedies granted under the Transaction Documents.

Without limiting the paragraph above, certain of the provisions contained in the Transaction Documents may be limited or rendered unenforceable under applicable laws and judicial decisions, including, without limitation, (i) waivers of notices, defenses, remedies or demands (or the delay or omission in enforcement thereof), (ii) clauses providing for recovery of attorneys' fees or other expenses of enforcement, (iii) liability limitations or liquidated damages, (iv) indemnification provisions, (v) provisions that purport to establish evidentiary standards, (vi) provisions that provide that the Transaction Documents may be modified or waived only in writing, (vii) waivers of the right to a jury trial, and (viii) provisions that purport to effect a choice of governing law or choice of forum for the adjudication of disputes other than with respect to (a) the enforceability by a New York State court under New York General Obligations Law Section 5-1401 of the choice of New York State law as the governing law of the Transaction Documents (subject, however, to the extent limited by the Constitution of the United States and by Section 1-105(2) of the New York Uniform Commercial Code), and (b) the enforceability by a New York State court under New York General Obligations Law Section 5-1402 of the choice of New York State law as a non-exclusive forum for the adjudication of disputes with respect to the Transaction Documents.

Our opinions expressed herein are limited to the laws of the State of California, the General Corporation Law of the State of Delaware, the Delaware Limited Liability Company Act, the federal law of the United States, and, in the case of paragraph 3 hereof, New York law, in each case to the extent not specifically excluded herein and as in effect on the date hereof, and we do not express herein any opinion as to any other laws. No opinion is expressed as to whether a court would recognize and enforce the provisions of the Purchase Agreement and such other agreements and instruments providing that the laws of the State of New York shall govern.

When the phrase "to our knowledge," or any similar phrase or word. is used herein, it means that the individual attorneys currently with our firm rendering services to the Sellers in connection with the transactions covered by this opinion letter have no actual knowledge

DG Cogen Partners, LLC
_____ _____, 2004
Page 4

that the subject matter is not as stated herein.  Such persons have not undertaken any investigation to determine the existence or nonexistence of any such matter, and no inference as to the extent of their knowledge should be drawn from the fact of their representation of the Sellers in this or any other instance.

The opinions rendered herein are based upon applicable law and factual circumstances (including the state of our knowledge) as of the date of this opinion (except as otherwise specified).  We do not undertake, and hereby expressly disclaim, any obligation to inform you of changes in any applicable law or relevant legal principles of law, or changes in our interpretation of such law or principles, or factual circumstance (including the state of our knowledge) subsequent to the date of this opinion.  Please note that we are opining only as to the matters expressly set forth herein, and no opinion should be inferred as to any other matters.

This opinion is rendered only to you pursuant to the Purchase Agreement and is solely for your benefit in connection with the above transaction.  This opinion may not be relied upon by any other person for any other purpose or in any other context, or furnished to, used, circulated, quoted or referred to, or relied upon by, any person for any purpose without our prior written consent.

Very truly yours,


IRELL & MANELLA LLP

1116487 3

## Schedule I

RealEnergy, Inc.

RealEnergy Projects I LLC

RealEnergy Projects II LLC

**EXHIBIT D**

OPINION OF SCOTT S. THOMPSON, ESQ.

DG Cogen Partners, LLC
733 Eighth Avenue
San Diego, CA 92101
Attn: Steven Mueller

Re:    RealEnergy, Inc., RealEnergy Projects I LLC and RealEnergy Projects II
       LLC

Ladies and Gentlemen:

This opinion is delivered pursuant to Section 3.02(j) of the Asset Purchase Agreement (the **"Purchase Agreement"**), dated as of April 27, 2004, by and among RealEnergy, Inc., a Delaware corporation (**"RealEnergy"**), RealEnergy Projects I, LLC, a Delaware limited liability company (**"RE Projects I"**), RealEnergy Projects II LLC, a Delaware limited liability company (**"RE Projects II,"** and, collectively with RealEnergy and RE Projects I, the **"Sellers"**), and DG Cogen Partners, LLC, a Delaware limited liability company (**"Buyer"**). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

I am General Counsel of RealEnergy and have acted in such capacity in connection with the transactions contemplated by the Purchase Agreement. For the purpose of rendering this opinion, I have reviewed the following documents (collectively, the **"Transaction Documents"**):

(a)    the Purchase Agreement;

(b)    the Bill of Sale and Instrument of Assignment, dated as of the date hereof, made by the Sellers for the benefit of Buyer; and

(c)    the Instrument of Assumption, dated as of the date hereof, executed by Buyer for the benefit of the Sellers.

In addition, I have made such investigations of law and have examined such certificates of public officials and officers and directors of the Sellers as I have considered necessary for purposes of this opinion. I also have reviewed such other matters and documents as I have deemed necessary or relevant as a basis for this opinion. In my review, I have assumed, without investigation, the legal capacity of all natural persons signing documents in their respective individual or official capacities, the genuineness of all signatures, the authenticity of all documents submitted to me as originals, the conformity to original documents of all documents submitted to me as certified or reproduction copies, the authenticity of the originals of such copies and the absence of any amendment, modification, waiver, agreement or understanding of any nature between or among the parties to the Transaction Documents as reviewed by me that would change, alter or otherwise affect the terms of such documents. I have relied upon the accuracy of the aforementioned certificates of public officials and, as to certain matters of fact, certificates of officers and directors of

the Sellers and the representations and warranties of the parties (as to factual matters) contained in the Transaction Documents. Further, I have assumed (i) the due authorization, execution and delivery of the Transaction Documents, and all agreements and instruments executed in connection therewith, by all parties thereto (other than the Sellers), and (ii) that such documents are valid and binding obligations of such parties (other than with respect to the Sellers).

Based upon the foregoing, and on the assumptions herein set forth, and subject to the limitations, qualifications and exceptions set forth herein, I am of the opinion that, except as disclosed in the Disclosure Schedule, the execution and delivery of the Transaction Documents do not, and the consummation of the transactions contemplated thereby and compliance with the terms thereof will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or loss of a material benefit under any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, agreement or arrangement to which any Seller is a party or by which any Seller or any of the Purchased Assets is bound, in each case, except as would not constitute a Material Adverse Effect.

I am admitted to practice law in the State of California, and, accordingly, the opinions expressed herein are limited to the laws of the State of California, and I do not express herein any opinion as to any other statutes, regulations, treaties, common laws or other laws.

The opinions rendered herein are based upon applicable law and factual circumstances as of the date of this opinion. I do not undertake, and hereby expressly disclaim, any obligation to inform you of changes in any applicable law or relevant legal principles of law, or changes in our interpretation of such law or principles, or factual circumstance subsequent to the date of this opinion. Please note that I am opining only as to the matters expressly set forth herein, and no opinion should be inferred as to any other matters.

This opinion is rendered only to you pursuant to the Purchase Agreement and is solely for your benefit in connection with the above transaction. This opinion may not be relied upon by any other person for any purpose or in any other context, or furnished to, used, circulated, quoted or referred to, or relied upon by, any person for any purpose without my prior written consent.

Very truly yours,

Scott S. Thompson
General Counsel

EXHIBIT E

INSTRUMENT OF ASSUMPTION

# INSTRUMENT OF ASSUMPTION

THIS INSTRUMENT OF ASSUMPTION (this "**Instrument**"), dated as of
_____, 2004, is made by DG Cogen Partners, LLC, a Delaware limited liability
company ("**Buyer**"), with reference to the following facts:

A.     Pursuant to the Asset Purchase Agreement, dated as of April 27, 2004 (the
"**Purchase Agreement**"), by and among RealEnergy, Inc., a Delaware corporation
("**RealEnergy**"), RealEnergy Projects I LLC, a Delaware limited liability company ("**RE
Projects I**"), RealEnergy Projects II, LLC, a Delaware limited liability company ("**RE
Projects II**", and, collectively with RealEnergy and RE Projects I, "**Sellers**"), and DG Cogen
Partners, LLC ("**Buyer**"), Buyer has agreed, subject to the terms and conditions set forth
therein, to purchase the Purchased Assets in exchange for the consideration set forth in the
Purchase Agreement, including the assumption of the Purchased Liabilities. All capitalized
terms used herein but not otherwise defined herein have the meanings set forth in the
Purchase Agreement.

B.     This Instrument is intended to effect the assumption by Buyer of the
Purchased Liabilities from Sellers, pursuant to the terms and conditions hereinafter
provided.

1.     Assumption of Liabilities.

As further consideration for the Purchased Assets, and subject to Section 2 of this
Instrument, Buyer hereby assumes the following liabilities and obligations of Seller and no
others:

(a)     Assigned Leases, Permits and Contract Rights. All liabilities and
obligations arising under or related to the Assigned Leases, Permits and Contract Rights
assigned to Buyer pursuant to Sections 2.01(b), 2.01(c) and 2.01(d), respectively, of the
Purchase Agreement, to the extent arising after the Closing;

(b)     Acquired Debt. The Acquired Debt;

(c)     Taxes. All real property Taxes and personal property Taxes related to
the Purchased Assets attributable to any taxable period ending after the Closing; and

(d)     Other Liabilities. All other liabilities and obligations relating the
Purchased Assets to the extent arising after the Closing.

2.     Obligations and Liabilities Not Assumed.

Notwithstanding anything to the contrary contained in Section 1 hereof, Buyer shall
not assume or be liable with respect to, and Sellers shall remain liable for, any of the
following liabilities or obligations:

(a)    Litigation.  All liabilities or obligations of Sellers for any litigation, claim, dispute or action, including, without limitation, those listed on Schedule 2.04(a) of the Purchase Agreement;

(b)    Contract Rights and Permits.  All liabilities or obligations arising under or related to any Contract Right (other than the Acquired Debt) or Permit arising before the Closing;

(c)    Taxes.  All liabilities or obligations for Taxes of Sellers arising before and after the Closing or liabilities or obligations for real property Taxes or personal property Taxes related to the Purchased Assets with respect to a Pre-Closing Tax Period (but, for the avoidance of doubt, excluding any Transaction Taxes, for which Buyer acknowledges that it shall be liable, as provided in Section 2.07(b) of the Purchase Agreement);

(d)    Environmental.  All liabilities or obligations for any violation or breach of any Environmental Law arising before the Closing;

(e)    Employees; ERISA.  All liabilities or obligations associated with present or former employees, agents, representatives, consultants or other personnel, including, without limitation, any liability or obligation under any Employee Benefit Plan or ERISA; and

(f)    Excluded Assets.  All liabilities or obligations associated with the Excluded Assets or relating the Purchased Assets to the extent arising before the Closing.

3.    Miscellaneous.

    3.1    Headings.  The headings contained in this Instrument are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

    3.2    Further Assurances.   Buyer agrees to execute such other and further documents and to do such other and further acts as may be reasonably required to effectuate the intent of the parties and carry out the terms and provisions of this Instrument.  From time to time after the date hereof, at the request of the Sellers' Representative, and at the expense of the Sellers but without further consideration, Buyer will execute and deliver such other instruments of assumption and transfer and take such other action as the Sellers' Representative may reasonably request in order more effectively to assume the Purchased Liabilities from Buyer.

    3.3    Governing Law.  This Instrument shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law.

**[SIGNATURE PAGE TO INSTRUMENT OF ASSUMPTION]**

IN WITNESS WHEREOF, this Instrument has been duly executed by Purchaser as of the date first above written.

**BUYER**

DG COGEN PARTNERS, LLC

By: _____

Name:

Title:

EXHIBIT F

OPINION OF PAUL, HASTINGS, JANOFSKY AND WALKER LLP

[_____], 2004                                          34928.00003

RealEnergy, Inc.                            RealEnergy Projects I, LLC
5957 Variel Avenue                          5957 Variel Avenue
Woodland Hills, California 91367            Woodland Hills, California 91367

RealEnergy Projects II, LLC
5957 Variel Avenue
Woodland Hills, California 91367

Ladies and Gentlemen:

       We have acted as counsel to DG Cogen Partners, LLC, a Delaware limited
liability company ("Buyer"), and ArcLight Energy Partners Fund I, L.P., a Delaware
limited partnership ("Parent" and, collectively with Buyer, "Affiliated Parties"), in
connection with the proposed purchase by Buyer of certain properties and assets from
RealEnergy, Inc., a Delaware corporation ("RealEnergy"), RealEnergy Projects I, LLC, a
Delaware limited liability company ("RealEnergy I"), and RealEnergy Projects II, LLC, a
Delaware limited liability company ("RealEnergy II", and, collectively with RealEnergy
and RealEnergy I, "Sellers"), and, in connection therewith, the assumption by Buyer of
certain of Sellers' liabilities, in each case pursuant to the Asset Purchase Agreement,
dated as of April [___], 2004 (the "Purchase Agreement"), among Buyer, Sellers and
Parent. This opinion is being delivered pursuant to Section 3.03(e) of the Purchase
Agreement. Unless otherwise defined, capitalized terms used herein will have the same
meanings ascribed to them in the Purchase Agreement.

       As such counsel, we have examined originals or copies, certified or
otherwise identified to our satisfaction, of such documents, corporate records, certificates
of public officials and other instruments as we have deemed necessary or appropriate as a
basis for the opinions set forth herein, including, without limitation:

           (i)       the Purchase Agreement;

STM/272437.6



RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____], 2004
2

(ii) the Bill of Sale and Instrument of Assignment, dated as of the date hereof (the "Bill of Sale");

(iii) the Instrument of Assumption, dated as of the date hereof (the "Instrument of Assumption") ;

(iv) the certificate of formation of Buyer certified as of [_____], 2004 by the Secretary of State of Delaware, and the operating agreement of Buyer as presently in effect, as certified by the Secretary of Buyer as of the date hereof, and the certificate of limited partnership of Parent certified as of [_____], 2004 by the Secretary of State of Delaware, and the limited partnership agreement of Parent as presently in effect, as certified by the Secretary of Parent as of the date hereof (collectively, the "Charter Documents");

(v) certificates of the Secretary of State of the State of Delaware as to the formation and good standing of Buyer and Parent under the laws of the State of Delaware as of [_____], 2004 (collectively, the "Good Standing Certificates");

(vi) resolutions adopted by Buyer's sole member on [_____], 2004, certified by the Secretary of Buyer, relating to the execution and delivery by Buyer of, and the performance by Buyer of its obligations under, the Transaction Documents, as defined below; and

(vii) good standing certificates of the Secretaries of State of the States of California and New Jersey as to the foreign qualification of Buyer as of [_____], 2004 (collectively, the "Foreign Good Standing Certificates").

The Purchase Agreement, the Bill of Sale and the Instrument of Assumption are referred to herein, individually, as a "Transaction Document" and, collectively, as the "Transaction Documents".

In addition to the foregoing, we have made such investigations of law as we have deemed necessary or appropriate as a basis for the opinions set forth herein.

In such examination and in rendering the opinions expressed below, we have assumed: (i) the due authorization, execution and delivery of each Transaction Document by all of the parties thereto (other than the due authorization, execution and delivery of the Transaction Documents by Affiliated Parties); (ii) the genuineness of all

STM/272437 6

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____], 2004
3

signatures on all documents submitted to us; (iii) the authenticity of all documents and limited liability company or partnership records submitted to us; (iv) that photocopy, electronic, certified, conformed, facsimile and other copies submitted to us of original documents, company or partnership records, certificates and other instruments conform to the original documents, limited liability company or partnership records, certificates and other instruments, and that all such original documents, limited liability company or partnership records, certificates and other instruments were authentic and complete; (v) the legal capacity of all individuals executing documents; (vi) that the Transaction Documents are the valid and binding obligations of each of the parties thereto (other than Affiliated Parties), enforceable against such parties (other than Affiliated Parties) in accordance with their respective terms, and that no such documents have been amended or terminated orally or in writing except as disclosed to us; (vii) that the statements contained in the certificates and comparable documents of public officials, officers and representatives of Affiliated Parties and other persons on which we have relied for the purposes of this opinion are true and correct and that there has not been any change in the good standing status of Affiliated Parties from that reported in the Good Standing Certificates and foreign qualifications of Buyer from that reported in the Foreign Good Standing Certificates; (viii) that Affiliated Parties have satisfied all regulatory and legal requirements applicable to its activities; and (ix) that the rights and remedies set forth in the Transaction Documents will be exercised reasonably and in good faith and were granted without fraud or duress and for good, valuable and adequate consideration and without intent to hinder, delay or defeat any rights of any creditor or member of Buyer. As to all questions of fact material to this opinion, we have relied (without independent investigation, except as expressly indicated herein) upon certificates or comparable documents of officers and representatives of Affiliated Parties and upon the representations and warranties of Affiliated Parties contained in the Transaction Documents, including the Purchase Agreement.

Statements in this opinion which are qualified by the expression "to our knowledge", "of which we have knowledge", "known to us" or "we have no reason to believe" or other expressions of like import are limited to the current actual knowledge of the individual attorneys in this Firm who have devoted substantive attention to the representation of Affiliated Parties in connection with the preparation, negotiation, execution and delivery of the Transaction Documents (but not the knowledge of any other attorney in this Firm or any constructive or imputed knowledge of any information, whether by reason of our representation of Affiliated Parties or otherwise). We have not undertaken any independent investigation to determine the accuracy of any such statement, and any limited inquiry undertaken by us during the preparation of this opinion should not be regarded as such an investigation.

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[ _____ ], 2004
4

     Based upon the foregoing, and in reliance thereon, and subject to the limitations, qualifications and exceptions set forth herein, we are of the following opinion:

     1.    Buyer is validly existing as a limited liability company in good standing under the laws of the State of Delaware, and Buyer has the limited liability power to enter into and carry out its obligations under the Transaction Documents.

     2.    Parent is validly existing as a limited partnership in good standing under the laws of the State of Delaware, and Parent has the limited partnership power to enter into and carry out its obligations under the Transaction Documents.

     3.    Based solely on a review of the Foreign Good Standing Certificates, we confirm that Buyer is in good standing as a foreign corporation in the States of California and New Jersey, as of the respective dates of the Foreign Good Standing Certificates.

     4.    The execution, delivery and performance of the Transaction Documents to which Buyer is a party have been duly authorized by all necessary limited liability company action on the part of Buyer, and each of the Transaction Documents has been duly executed and delivered by Buyer.

     5.    The execution, delivery and performance of the Purchase Agreement has been duly authorized by all necessary partnership action on the part of Parent, and the Purchase Agreement has been duly executed and delivered by Parent.

     6.    Each of the Transaction Documents to which each Affiliated Party is a party constitutes the valid and binding obligation of such Affiliated Party, enforceable against such Affiliated Party in accordance with its terms.

     7.    The execution and delivery by each Affiliated Party of the Transaction Documents to which it is a party and the assumption of liabilities by such Affiliated Party in accordance with the Transaction Documents, do not (i) cause such Affiliated Party to violate any Federal, or New York State law, rule or regulation; or (ii) cause such Affiliated Party to violate any order, judgment or decree of any Federal or New York State court or governmental instrumentality to which such Affiliated Party is a named party and which is known to us; or (iii) constitute a breach by Buyer of, or constitute a default by Buyer under, any agreements known to us to which Buyer is a party or by which its properties or assets are bound or (iv) cause such Affiliated Party to violate any provision of its respective Charter Documents

     The foregoing opinions are subject to the following exceptions, qualifications and limitations:

STM/272437 6

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____], 2004
5

     A.    We express no opinion with respect to any of the following (collectively, the "Excluded Laws"): (i) anti-fraud laws or other federal and state securities laws; (ii) Federal Reserve Board margin regulations; (iii) pension and employee benefit laws, e.g., ERISA; (iv) federal and state antitrust and unfair competition laws; (v) the statutes, ordinances, administrative decisions and rules and regulations of counties, towns, municipalities and other political subdivisions (whether created or enabled through legislative action at the federal, state or regional level); (vi) federal and state environmental laws; (vii) federal and state land use and subdivision laws; (viii) federal and state tax laws; (ix) federal and state laws relating to communications (including, without limitation, the Communications Act of 1934, as amended, and the Telecommunications Act of 1996, as amended); (x) federal patent, copyright and trademark, state trademark and other federal and state intellectual property laws; (xi) federal and state racketeering laws, e.g., RICO; (xii) federal and state health and safety laws, e.g., OSHA; (xiii) federal and state laws concerning aviation; (xiv) federal and state laws concerning public utilities; (xv) federal and state labor laws; (xvi) federal and state laws and policies concerning (A) national and local emergencies, (B) possible judicial deference to acts of sovereign states, and (C) criminal and civil forfeiture laws; and (xvii) other federal and state statutes of general application to the extent they provide for criminal prosecution (e.g., mail fraud and wire fraud statutes); and in the case of each of the foregoing, all rules and regulations promulgated thereunder or administrative or judicial decisions with respect thereto.

     B.    We express no opinion with respect to (i) the truth of the factual representations and warranties contained in any of the Transaction Documents; or (ii) except to the extent set forth in clause (iii) of opinion paragraph 7, any document, instrument or agreement (including the exhibits or schedules to any Transaction Document) other than the Transaction Documents regardless of whether such document, instrument or agreement is referred to in the Transaction Documents.

     C.    We express no opinion with respect to the effect that the introduction of extrinsic evidence as to the meaning of any Transaction Document may have on the enforceability thereof.

     D.    With respect to our opinions set forth in paragraphs 1, 2 and 3 above, with your permission, we are relying solely and without independent investigation on the Good Standing Certificates and the Foreign Good Standing Certificates and a certificate of an officer of each Affiliated Party and any documents certified to us thereby.

     E.    Our opinions set forth in paragraph 6 above are subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium, bulk transfer, successor liability or similar laws and principles affecting creditors' rights generally, including without limitation fraudulent transfer and fraudulent conveyance laws; (ii) the

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____], 2004
6

effect of public policy considerations or court decisions which may limit rights to obtain indemnification or contribution; and (iii) the effect of general principles of equity (including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing) and the availability of equitable remedies (including, without limitation, specific performance and equitable relief), regardless of whether considered in a proceeding in equity or at law.

       F.    No opinion is expressed herein with respect to (i) the validity or enforceability of any provision contained in the Transaction Documents allowing any party to exercise any remedial rights without notice to any other party; (ii) the validity or enforceability of any waiver of demand by any party, or any waiver of any rights or any defense which as a matter of law or public policy cannot be waived; (iii) the validity or enforceability of any provisions contained in the Transaction Documents purporting to establish evidentiary standards, (iv) the validity or enforceability of any provision of the Transaction Documents which purports to establish the subject matter jurisdiction of the United States District Court to adjudicate any controversy related to any of the Transaction Documents; (v) the validity or enforceability of any provision of the Transaction Documents which purports to entitle any person or entity to specific performance of any provision thereof; (vi) the validity or enforceability of any provision of the Transaction Documents which requires a person or entity to cause another person or entity to take or to refrain from taking action under circumstances in which such person or entity does not control such other person or entity; (vii) the validity or enforceability of any provision of the Transaction Documents insofar as it purports to effect a choice of governing law or choice of forum for the adjudication of disputes other than (a) the enforceability by a New York State court under New York General Obligations Law Section 5-1401 of the choice of New York State law as the governing law of the Transaction Documents (subject, however, to the extent limited by the Constitution of the United States and by Section 1-105(2) of the New York Uniform Commercial Code), and (b) the enforceability by a New York State court under New York General Obligations Law Section 5-1402 of the choice of New York State courts as a non-exclusive forum for the adjudication of disputes with respect to the Transaction Documents; or (viii) the effectiveness of service of process by mail in any suit, action or proceeding of any nature arising in connection with or in any way relating to any Transaction Document.

       G.    Our opinions in paragraph 6 above and clause (i) of paragraph 7 above are limited solely to laws, rules and regulations (other than the Excluded Laws) that in our experience are generally applicable to transactions in the nature of those contemplated by the Transaction Documents between unregulated parties.

       H.    No opinion is expressed as to the validity or enforceability of any provision of any Transaction Document that (i) requires that waivers or amendments

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____ ], 2004
7

must be in writing in so far as it suggests that oral or other modifications, amendments or waivers could not be effectively agreed upon by the parties or that the doctrine of promissory estoppel might not apply; (ii) waives (a) vague or broadly stated rights, (b) future rights, (c) the benefits of statutory, regulatory or constitutional rights, unless and to the extent that the statute, regulation or constitution expressly allows waiver, (d) unknown future defenses, or (e) rights to damages; (iii) states that rights or remedies are not exclusive, that every right or remedy is cumulative and may be exercised in addition to any other right or remedy, that the election of some particular remedy does not preclude recourse to one or more others or that failure to exercise or delay in exercising rights or remedies will not operate as a waiver of any such right or remedy; (iv) imposes penalties, forfeitures, late payment charges or an increase in interest rate upon delinquency in payment or the occurrence of a default; (v) appoints one party as an attorney-in-fact for an adverse party; or (vi) states that time is of the essence.

I.    With respect to our opinions set forth in paragraphs 5 and 7 above, with your permission, we are relying solely on the opinion, dated the date hereof, of John Tisdale, Esq., General Counsel to the Parent, a copy of which attached hereto as <u>Exhibit A</u>.

Without limiting any of the other limitations, exceptions and qualifications stated elsewhere herein (including, without limitation, qualification paragraph A with respect to Excluded Laws), we express no opinion with regard to the applicability or effect of the law of any jurisdiction other than, as in effect on the date of this letter, (i) the internal laws of the State of New York, (ii) the Delaware Limited Liability Company Act and the Delaware Revised Uniform Limited Partnership Act (based solely upon our review of a standard compilation thereof), and (iii) the Federal laws of the United States.

This opinion letter deals only with the specified legal issues expressly addressed herein, and you should not infer any opinion that is not explicitly addressed herein from any matter stated in this letter.

This opinion is rendered solely to you for the purpose set forth in the first paragraph of this letter. This opinion may not be relied upon by you for any other purpose or delivered to or relied upon by any other person without our express prior written consent; except that you may furnish a copy of this opinion for information (but not reliance): (i) to your independent auditors and your attorneys, (ii) pursuant to order or legal process of any court or governmental agency, and (iii) in connection with any legal action to which you are a party arising out of the transactions contemplated under the Transaction Documents. This opinion is rendered to you as of the date hereof and is not to be deemed to have been reissued by any subsequent delivery as permitted above, and we assume no obligation to advise you or any other Person hereafter with regard to any change after the date hereof in the circumstances or the law that may bear on the matters

RealEnergy, Inc.
RealEnergy Projects I, LLC
RealEnergy Projects II, LLC
[_____], 2004
8

set forth herein even though the change may affect the legal analysis or a legal conclusion
or other matters in this opinion letter.

Very truly yours,

Exhibit A

[Opinion of John Tisdale, Esq.]

**EXHIBIT G**

**CONSENT OF CAPITALSOURCE FINANCE LLC**

SEE TABS 5 AND 6

**EXHIBIT C**



3202 W. Warner Avenue
Santa Ana, CA 92704
(714) 435-0045

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 7/18/2006 | 0018 |

**Vendor:**

Advanced Power Distributor
West Highway 56
Sublette, KS 67877
620-675-2224 (p)
620-675-2260 (f)

**Ship To:**

Western Machinery
340-A W. Channel Road
Benicia, CA 94510
(707)-747-0125

REF:

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | Head Kit, Retrofit GE12TI plus shipping, 4 to 5 day ground | 2 | $3,602.00 | | | $7,204.00 |
| | | | | | **Total:** | $7,204.00 |

Signature:                                    Date: 07/18/06

# DG COGEN PARTNERS LLC

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 12/13//2006 | 0042 |

**Vendor:**
Advanced Power Distributors INC
PO Box 520, Hwy 56 West
Sublette, KS 67877
620-675-2224 p
620-675-2260 f

**Ship To:**
Simmax Energy
645 Tank Farm Road, Unit E
San Luis Obispo, CA 93401
PLEASE CALL BEFORE DROP-OFF!
805-543-2780 (p)
805-543-2832 (f)

REF:

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | GE12T1 Kit: Includes 2 Heads and all gaskets and pipes, assembled ready to install on engine. This is the factory Daewoo '13000' series head for Daewoo 11L engine. | 16 | $4,035.26 | | | $64,564.16 |
| | | | | | **Total:** | $64,564.16 |

**PLEASE CALL BEFORE DROP-OFF AT DESTINATION!**

Signature: _____     Date: 12/13/06

**DG COGEN PARTNERS** LLC

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 1/30/2007 | 0045 |

**Vendor:**
Advanced Power Distributors INC
PO Box 520, Hwy 56 West
Sublette, KS 67877
620-675-2224 p
620-675-2260 f

**Ship To:**
Simmax Energy
645 Tank Farm Road, Unit E
San Luis Obispo, CA 93401
PLEASE CALL BEFORE DROP-OFF!
805-543-2780 (p)
805-543-2832 (f)

REF:

| Terms | Account # |
|-------|-----------|
|  |  |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | GE12TI Kit: Includes 2 Heads and all gaskets and pipes, assembled ready to install on engine. This is the factory Daewoo '13000' series head for Daewoo 11L engine. | 6 | $4,035.26 |  |  | $24,211.56 |
|  |  |  |  |  | **Total:** | $24,211.56 |

**PLEASE CALL BEFORE DROP-OFF AT DESTINATION!**

Signature: _____       Date: 1/30/07

**DG COGEN PARTNERS** LLC

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 4/18/2007 | 0053 |

**Vendor:**
Advanced Power Distributors INC
PO Box 520, Hwy 56 West
Sublette, KS 67877
620-675-2224 p
620-675-2260 f

**Ship To:**
Simmax Energy
645 Tank Farm Road, Unit E
San Luis Obispo, CA 93401
PLEASE CALL BEFORE DROP-OFF!
805-543-2780 (p)
805-543-2832 (f)

REF:

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | GE12TI Kit: Includes 2 Heads and all gaskets and pipes, assembled ready to install on engine. This is the factory Daewoo '13000' series head for Daewoo 11L engine. | 5 | $4,035.26 | | | $20,176.30 |
| | | | | | **Total:** | $20,176.30 |

**PLEASE CALL BEFORE DROP-OFF AT DESTINATION!**

Signature: _____        4/18/2007


**DG COGEN PARTNERS** LLC

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 6/20/2007 | 0062 |

**Vendor:**
Advanced Power Distributors INC
PO Box 520, Hwy 56 West
Sublette, KS 67877
620-675-2224 p
620-675-2260 f

**Ship To:**
Simmax Energy
645 Tank Farm Road, Unit E
San Luis Obispo, CA 93401
PLEASE CALL BEFORE DROP-OFF!
805-543-2780 (p)
805-543-2832 (f)

REF:

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | GE12TI Kit: Includes 2 Heads and all gaskets and pipes, assembled ready to install on engine. This is the factory Daewoo '13000' series head for Daewoo 11L engine. | 4 | $4,035.26 | | | $16,141.04 |
| | | | | | **Total:** | $16,141.04 |

**PLEASE CALL BEFORE DROP-OFF AT DESTINATION!**

Signature: _____    6/20/2007     



**DG COGEN PARTNERS LLC**

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 8/28/2007 | 0075 |

*Vendor:*

Advanced Power Distributors INC
PO Box 520, Hwy 56 West
Sublette, KS 67877
620-675-2224 p
620-675-2260 f

*Ship To:*

Simmax Energy
c/o Anthony Holt
100 McLellan Dr., #1104
South San Francisco, CA 94080
805-543-2780 (p)
360-340-8995 (p)

REF:

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | GE 12TI Heads. These are the Daewoo | 1 | $4,695.00 | | | $4,695.00 |
|  | 13000' series head for Daewoo 11L | | | | | |
|  | engine- includes 2 heads. | | | | | $0.00 |
| 2 | Head Bolts | 0 | | | | $0.00 |
| 3 | Front Head Gaskets (65.03901-0063A) | 1 | 82.91 | | | $82.91 |
| 4 | Rear Head Gaskets (65.03901-0064A) | 1 | 82.91 | | | $82.91 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  | PLEASE SHIP OVERNIGHT! | | | | | |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  | | **Total:** | | $4,860.82 |

**PLEASE SHIP OVERNIGHT!!**

Signature: _[signature]_                8/28/2007



**DG COGEN PARTNERS** LLC

3534 Empleo, Suite A
San Luis Obispo, CA 93401
(805) 543-2780

# PURCHASE ORDER

| Date | P.O. # |
|------|--------|
| 1/31/2008 | 00104 |

| **Vendor:** |
|---|
| Advanced Power Distributors INC |
| PO Box 520, Hwy 56 West |
| Sublette, KS 67877 |
| 620-675-2224 p |
| 620-675-2260 f |

| **Ship To:** |
|---|
| Simmax Energy |
| 3534 Empleo St, Ste A |
| San Luis Obsipo, CA 93401 |
| 805-543-2780 (p) |
| 805-543-2832 (f) |

**REF:**

| Terms | Account # |
|-------|-----------|
|       |           |

| Item | Description | Qty. | Rate | Customer | Class | Amount |
|------|-------------|------|------|----------|-------|--------|
| 1 | Exhaust Valve Seat (65.03203-1037) | 15 | $9.92 | | | $148.80 |
| 2 | Valve Guide (65.03201-1008E) | 15 | $4.03 | | | $60.45 |
| | | | | | | |
| | PLEASE SHIP OVERNIGHT! | | | | | |

| **Total:** | $209.25 |
|---|---|

**Please Ship Overnight!**

Signature: _____          1/31/2008